## THORSCH v. MILLER, Alien Property Custodian et al.

(Court of Appeals of District of Columbia. Submitted December 9, 1924. Decided April 6, 1925.)

No. 4130.

1. War ⟷12—Claimant of property held by Alien Property Custodian held not entitled to standing as naturalized citizen.

Under Act March 4, 1923, adding section 21 to Trading with the Enemy Act, providing that claims of any naturalized citizen to property held by Alien Property Custodian should not be denied on ground of any presumption of expatriation, arising under Act March 2, 1907, § 2 (Comp. St. § 3959), if claimant should give satisfactory evidence of his loyalty during his absence from the United States, claimant, a native of Austria, who resided in United States many years, becoming naturalized citizen in 1898, returned to Austria in 1912, served as vice consul of United States until breaking off of diplomatic relations in 1917, and thereafter engaged in banking business in Vienna, subscribed to Austrian war loans, and never resumed residence in United States, held not entitled to prosecute his claim as a naturalized citizen.

2. War ⟷12—Statutory provisions requiring claimant of property held by Alien Property Custodian to give evidence of loyalty, rebutting presumptions of expatriation, held applicable.

Provisions of Act March 4, 1923, adding section 21 to the Trading with the Enemy Act, providing that claim of naturalized citizen to property held by Alien Property Custodian should not be denied on ground of any presumption of expatriation arising under Act March 2, 1907, § 2 (Comp. St. § 3959), if claimant should give satisfactory evidence of his loyalty during absence from United States, held applicable, though claimant, native of Austria and a naturalized citizen of the United States, during three years of his absence from the United States and until breaking off of domestic relations in 1917, was vice consul of the United States at Vienna, that officer not being required to be a citizen of the United States at that time, and particularly where claimant, after resignation of such office, con-

tinued to reside in that country for more than two years before commencement of suit on claim.

**3. War ⬡⟳12—Residence abroad during war time is counted in computing period of absence from country resulting in presumption of expatriation, notwithstanding provision against expatriation when country is at war.**

Under Act March 4, 1923, adding section 21 to the Trading with the Enemy Act, requiring naturalized citizen claiming property held by Alien Property Custodian, against whom a presumption of expatriation has arisen, under Act March 2, 1907, § 2 (Comp. St. § 3959), from residence abroad, to give proof of his loyalty during absence from the country, residence abroad during war time is counted in computing period of absence from country, notwithstanding provision in latter act that no American citizen shall be allowed to expatriate himself when country is at war.

**4. Evidence ⬡⟳47—Court of Appeals of District of Columbia will take judicial notice of rulings of Department of State.**

Court of Appeals of District of Columbia will take judicial notice of rulings of Department of State.

**5. War ⬡⟳12—Rules for computing duration of foreign residence affecting presumption of expatriation applicable alike to situations arising under act declaring such presumption and to those arising under act amendatory of Trading with the Enemy Act.**

Rules for computing duration of foreign residence, under Act March 2, 1907, § 2 (Comp. St. § 3959), creating a presumption of expatriation from extended residence in foreign state, apply equally to situations arising under Act March 4, 1923, adding section 21 to the Trading with the Enemy Act, relating to claims of naturalized citizens against whom a presumption of expatriation has arisen, to property held by Alien Property Custodian.

**6. War ⬡⟳12—Statute requiring proof of loyalty by naturalized citizens against whom presumption of expatriation has arisen, in prosecution of claims for property held by Alien Property Custodian, applicable to suit commenced before its enactment.**

Act March 4, 1923, adding section 21 to the Trading with the Enemy Act, requiring naturalized citizens, against whom a presumption of expatriation has arisen from residence in foreign state, to give proof of their continued loyalty when prosecuting claims for property held by Alien Property Custodian, held applicable to suit commenced, but not concluded, before its enactment.

**7. War ⬡⟳12—Evidence held insufficient to establish claimant's purchase of corporate stock before its seizure by Alien Property Custodian.**

Evidence held insufficient to establish claimant's purchase of corporate stock before its seizure by Alien Property Custodian.

Appeal from the Supreme Court of the District of Columbia.

Suit by Hugo Thorsch against Thomas W. Miller, as Alien Property Custodian, and Frank White, as Treasurer of the United States. Decree for defendants, and plaintiff appeals. Affirmed.

G. T. Farrell, L. S. Rappaport, and H. H. McCormick, all of Washington, D. C., for appellant.

D. H. Stanley, of Washington, D. C., and John Marshall, of Parkersburg, W. Va., for appellees.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and HATFIELD, Judge of the United States Court of Customs Appeals.

MARTIN, Chief Justice. This suit was brought by Hugo Thorsch under section 9 of the Trading with the Enemy Act as amended (42 Stat. 1511), to recover from the Alien Property Custodian the proceeds of certain 3,550 shares of the capital stock of the Werner-Pfleiderer Company, a Michigan corporation, which had been seized by the Custodian on March 7, 1918, as the property of Richard and Otto Werner, who were citizens and residents of Germany.

Mr. Thorsch claimed that he was a naturalized citizen of the United States, that he had bought the stock in question from the Werners on March 12, 1917, a year before the Custodian seized it, and that he was the sole owner of it at the time of the seizure. He claimed accordingly that the property or its proceeds should be returned to him under subsections (a) and (b) of section 9 of the act as amended, since he was not an enemy or ally of enemy, nor a citizen or subject of Germany, Austria, Hungary, or Austria-Hungary. The Custodian denied that Thorsch was a citizen of the United States, and also denied that he was the owner of the property in question at the time of its seizure. The lower court decreed against the claimant, who thereupon appealed.

The first question which arises upon the record is whether Mr. Thorsch has established his right to maintain this suit as a naturalized citizen of the United States. The following enactments relate to that subject:

On March 2, 1907, Congress passed an act in reference to the expatriation of citizens and their protection abroad. 34 Stat. 1228 (U. S. Comp. St. §§ 3958–3964). Section 2 thereof reads in part as follows:

"Sec. 2. * * * When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of resi-

dence during said years: Provided, however, that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: And provided also, that no American citizen shall be allowed to expatriate himself when this country is at war."

On March 4, 1923, Congress passed an act to amend the Trading with the Enemy Act (42 Stat. 1511). Section 21 thereof, as added, reads as follows:

"Sec. 21. That the claim of any naturalized American citizen under the provisions of this act shall not be denied on the ground of any presumption of expatriation which has arisen against him, under the second sentence of section 2 of the act entitled 'An act in reference to the expatriation of citizens and their protection abroad,' approved March 2, 1907, if he shall give satisfactory evidence to the President, or the court, as the case may be, of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control."

It appears that Mr. Thorsch was born in the city of Prague, Austria. In 1894, when he was 19 years of age, he emigrated to this country, and became a naturalized citizen in 1898. In the course of time he established a printing business in Indianapolis, and by 1912 he had amassed a fortune of about $500,000. His family then consisted of his wife and one son. In the summer of 1912 he made sale of all of his property located in this country including his business and his home, converted the proceeds into Austrian money, and removed with his family to Vienna, Austria. He and his family have made temporary visits to the United States since that time, but nevertheless Vienna has been their place of general abode from the summer of 1912 up to the present time. Mr. Thorsch states that he never intended to expatriate himself, but always expected to return at some future time to this country. The testimony relating to an intentional expatriation upon his part is conflicting; but we do not find it necessary now to pass upon that question.

On August 28, 1914, after the war broke out in Europe, Mr. Thorsch became vice consul of the United States at Vienna, resigning on April 14, 1917, after diplomatic relations between this country and Austria were broken off. He and his family then continued to reside at Vienna, and during the war which followed he was not interned, nor was his property sequestered, but he continued as before to engage unrestrictedly in business in that city. In 1916 he assisted in establishing the Vienna Bank of Commerce, investing the greater part of his fortune in its stock, and becoming a director and also a member of the executive committee of the bank. He held these positions throughout the war, during which time the bank subscribed to each of the war loans issued by Austria, whereby that country was assisted in waging war against the United States and its allies. Nor has he ever become a resident of the United States since that time.

[1] These facts bring Mr. Thorsch within the limitations of section 21, Act of March 4, 1923, supra, and prevent him from recovering as a naturalized American citizen in this suit; for he had resided for two years in the foreign state from which he came, and consequently could not recover against the Custodian without first giving satisfactory evidence to the court "of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control." Mr. Thorsch has utterly failed to give any evidence of that character. It should be noted that these requirements are not mere rules of evidence for ascertaining whether a naturalized American citizen thus residing abroad had thereby intentionally expatriated himself. They serve rather as a limitation upon the Trading with the Enemy Act, prohibiting any naturalized citizen of the United States from recovering under section 9 of the act after residing abroad for the prescribed period, without first proving his uninterrupted loyalty to this country while abroad, and that he had returned to the United States, or been prevented from doing so by circumstances beyond his control.

[2, 3] These conditions apply in this case notwithstanding the fact that Mr. Thorsch was vice consul of the United States at Vienna during three years of his residence in that city, and that he had secured passports upon the occasions of his visits to this country. For at that time it was not required that such an officer should be a citizen of this country, and moreover Mr. Thorsch continued thereafter to reside in Vienna for more than two years before the commencement of this case. Section 2 of the act of March 2, 1907, provides that no American

citizen shall be allowed to expatriate himself when this country is at war; nevertheless residence abroad during war time is to be counted when computing the period of absence from this country for the present purpose. The Department of State, acting under the authority conferred upon it by the section, has ruled to this effect in General Consular Instruction No. 919, issued November 24, 1923, as follows:

"The presumption, under the second paragraph of section 2 of the Act of March 2, 1907, that naturalized citizens who have resided for two years in the foreign state from which they came or for five years in another foreign state have ceased to be American citizens, according to the department's construction of the last proviso of this section, could not have arisen during the period when this country was at war. However, now that the war is over, residence abroad during the war should be counted in determining whether the presumption has arisen.

"It follows that, in the case of a naturalized citizen, when the two or five-year period of foreign residence was completed before April 6, 1917, the presumption of the loss of citizenship existed. However, if the two or five year period terminated between April 6, 1917, and July 2, 1921, then the presumption did not arise until the latter date, when the United States ceased to be at war. If the foreign residence began while this country was at war, such residence during the war period should be counted, although the presumption of loss of citizenship could not have arisen until after the termination of the war. In such case the amount of residence abroad during the war period should be added to that outside of the war period and the total used in computing the two or five year period. The period between the dates of expatriation and the taking of an oath of repatriation cannot be counted in computing the two or five year period. * * * It is the view of the department, in the absence of an opinion of the court of last resort, that the presumption of cessation of American citizenship, arising under the statute, from protracted residence abroad continues to exist only while a naturalized citizen continues to reside abroad, and that upon the return of the individual to the United States and upon his establishment there in good faith of a permanent residence reasons for the presumption disappear."

[4, 5] This court takes judicial notice of the foregoing ruling of the Department of State. Caha v. United States, 152 U. S. 211, 14 S. Ct. 513, 38 L. Ed. 415. That ruling of course relates to the general provisions of the Act of March 2, 1907, respecting the status of naturalized citizens after a period of residence abroad, and has no specific reference to the provisions of section 21 of the Trading with the Enemy Act. The rules, however, for computing the duration of foreign residence, are alike in both cases. Moreover, the department's interpretation of the law is manifestly correct, for when Congress in the latter act required proof of "uninterrupted loyalty" upon the part of naturalized citizens when residing abroad, it must have had in mind the conduct of such persons during the war, particularly if residing in an enemy country. It is hardly necessary to say that the present case is governed by the specific provisions of the Trading with the Enemy Act.

[6] It is contended, however, that the Act of March 4, 1923, should not apply to this case since the trial below was had, and the case submitted although not yet decided, before the enactment of that section. The suit, however, was not concluded at that time, and the record discloses that the trial court after the date of the enactment offered the plaintiff an opportunity to introduce evidence upon the issue of loyalty and of his return to this country, which he declined to do. We conclude accordingly that the plaintiff did not bring himself within the conditions prescribed by section 9 as amended, or section 21, and was not entitled to recover in this case.

[7] The second question which arises upon the record is whether Mr. Thorsch in fact bought the stock in question from the Werners on March 12, 1917, as alleged by him. The 3,550 shares represented practically the entire ownership of a certain factory located at Saginaw, Mich. The Custodian afterwards realized $338,500 from a sale of the sequestered stock. It is claimed by Mr. Thorsch that these shares were owned by the Werners, who were then soldiers in the German army; that the stock certificates had been signed in blank by the owners and left in the hands of Dr. Rosner, an Austrian attorney, for such disposition as he might deem to be for the owners' interest; that on March 12, 1917, in a "hand to hand" transaction, Mr. Thorsch exchanged 4,000 shares of his stock in the Vienna Bank of Commerce for the 3,550 shares of stock in question, and thereby became the sole owner of the latter. Mr. Thorsch had never seen the factory nor had any business relations with it nor with the Werners. He states, however, that he examined certain reports of the

factory's business in former years, and also relied upon the representations of Dr. Rosner.

At the time when he claims to have acquired the stock he was acting as American vice consul at Vienna, and a month intervened before his associates left that city because of the cessation of diplomatic relations between the two countries. Yet Mr. Thorsch never mentioned the transaction to any of them, nor did he send any notice thereof at any time to the Saginaw corporation, nor attempt in any manner to have the shares transferred to his name. He explains this by saying that the business was then in the charge of an efficient manager, who might refuse to continue as such if informed of the transfer of ownership. When Mr. Thorsch left Indianapolis in 1912 he was closely associated with a certain attorney of that city, in whom he placed great confidence, by whom indeed some of Mr. Thorsch's property was sold at the time of his removal to Vienna. This attorney still resided in Indianapolis, but no word was sent to him concerning the alleged transaction. In fact, according to Mr. Thorsch's statements, he owned the stock two years and a half without sending a single communication to any one with reference to it or the corporation's business. The Custodian seized the corporate shares on March 7, 1918, as the property of the Werners. According to Mr. Thorsch's statement the Werners then had no interest whatever in the property, having parted with it a year previously. Nevertheless, on September 12, 1919, when the Custodian was about to make sale of the shares under section 12 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), the Werners sent a cablegram to him respecting the matter which is translated as follows:

"We are informed that our shares will be sold on September 12, we protest against this sale as being illegal, and ask Messrs. Staehle and Pletscher to protest in our name."

It is difficult to believe that the Werners made an unconditional transfer of the shares to Mr. Thorsch on March 12, 1917, when it thus appears that on September 12, 1919, they were claiming to be the owners of the stock, and were not only protesting against a sale of it by the Custodian, but were also appealing to their representatives in this country likewise to protest in their name. Mr. Thorsch and Dr. Rosner make an attempt as witnesses to reconcile this circumstance with their testimony concerning the alleged transfer of the stock on March 12, 1917, but they succeed only in making their narrative seem the more improbable. Mr. Thorsch states that it was not until October, 1919, that he first heard that the Alien Property Custodian had seized the stock. He says that he then cabled a protest to the Custodian, and also communicated with his attorney in this country, and that at the same time he notified Dr. Rosner that it had come to his knowledge that the property had been seized and was to be sold by the Alien Property Custodian, and that he would hold his clients, Richard and Otto Werner, responsible for all damages that he might suffer thereby.

However, according to the testimony, the Werners had cabled their protest to the Custodian a month before Mr. Thorsch learned of the seizure. Dr. Rosner explains that he had caused the Werners thus to cable the Custodian by advising them that they were obliged as sellers of the stock certificate to place Mr. Thorsch as buyer in full possession of the rights adhering thereto, and that, since they were still the apparent owners of the stock certificate sold by them to Mr. Thorsch, "as far as the knowledge of the American government was concerned, they were obliged, in order to prevent the imminent sale of the plant, to protest against the sale, so that Mr. Thorsch would not find it impossible to protect his rights acquired by the purchase of these stock certificates."

These explanations are altogether unsatisfactory, for it cannot be believed that Dr. Rosner, an experienced attorney, and Mr. Thorsch, a capable business man and banker, could have understood that the Werners would be liable to Mr. Thorsch because of the seizure of the shares two years after they were sold to him, or that the Werners could prevent a sale of Mr. Thorsch's shares by informing the Custodian that the shares belonged to them. Moreover, it does not appear how or why they had learned that Mr. Thorsch had failed to have the shares transferred to his own name, "as far as the knowledge of the American government was concerned," during the two years succeeding his alleged purchase of them. It may be noted here that the Werners were requested to testify by deposition in this case, but they refused to do so, and the only witnesses who testified to the alleged sale were Mr. Thorsch and Dr. Rosner.

Without extending this review of the record, we may say that the burden of proof respecting the ownership of the stock rested

upon the claimant, and that he has failed to discharge that burden.

The decree of the lower court is therefore affirmed, with costs.

Appeal allowed to United States Supreme Court June 13, 1925.