**STORY v. SNYDER et al.**
**No. 10202.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 6, 1949.

Decided June 12, 1950.

Writ of Certiorari Denied Oct. 23, 1950.
See 71 S.Ct. 88.

Wilbur K. Miller, Circuit Judge, dissented.

Mr. Edmund D. Campbell, Washington, D. C., with whom Messrs. Hugh H. Obear and Grissim H. Walker, Washington, D. C., were on the brief, for appellant.

Mr. Harold S. Harrison, Attorney, Department of Justice, Washington, D. C., with whom Assistant Attorney General A. Devitt Vanech and Mr. Roger P. Marquis, Attorney, Department of Justice, Washington, D. C., were on the brief, for appellees.

Before EDGERTON, WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

The question presented is whether the Library of Congress Trust Fund Board is subject to suit in the District Court for the District of Columbia, on a cause of action alleged to have arisen in connection with the administration of the Board's duties.

The complaint states that plaintiff-appellant is and has been a duly licensed real estate broker in the District of Columbia. It alleges that prior to September 28, 1945, plaintiff was authorized by the Trust Fund Board to list and offer for sale, as its real estate and on its behalf, a parcel of real estate belonging to the Board and located in the City of Washington. Appellant offered the property to a prospective purchaser. Thereafter the latter and the Board entered into a contract of sale whereby the property was purchased for $600,000. It is further alleged that the Board made the sale without providing for payment to the plaintiff of any real estate commission; that plaintiff was the procuring cause of the sale; that the usual and customary commission for such a sale amounted to $19,000, and that this also represented fair and reasonable compensation to plaintiff for services rendered in procuring the sale. Judgment was sought in the amount of $19,000.

The defendant members of the Board moved the District Court for dismissal of the complaint, stating that "the court lacks jurisdiction of the subject matter of the action for the reason that the defendants are an agency of the United States of America and this suit is in substance an action against the United States of America, which has not consented to be sued or waived its immunity from suit." The District Court sustained the motion and entered final judgment, dismissing the complaint for want of jurisdiction.

The Library of Congress Trust Fund Board was constituted pursuant to the act of March 3, 1925, c. 423, § 1, 43 Stat. 1107, 2 U.S.C.A. § 154. The Board is authorized by law to "accept, receive, hold, and administer * * * gifts, bequests, or devises of property for the benefit of, or in connection with, the Library [of Congress], its collections, or its service * * *." 2 U.S.C.A. § 156. The trustees consist of "the Secretary of the Treasury, the chairman of the Joint Committee on the Library, the Librarian of Congress, and two persons appointed by the President * * *." 2 U.S.C.A. § 154. They serve without compensation. While their expenditures are normally to be reimbursed from the income of the trust funds which they hold, "any expenses of the Board * * * not properly chargeable to the income of any trust fund held by it, shall be estimated for in the annual estimates of the librarian for the maintenance of the Library of Congress." 2 U.S.C.A. § 155. Before the Board may accept a gift or bequest, approval must be given by the Joint Committee on the Library. 2 U.S.C.A. § 156. The Board must "submit to the Congress an annual report of the moneys or securities received and held by it and of its operations." 2 U.S.C.A. § 163. The statute creating the Board further provides:

"The board shall have perpetual succession, with all the usual powers and obligations of a trustee, including the power to sell except as herein limited, in respect of all property, moneys, or securities which shall be conveyed, transferred, assigned, bequeathed, delivered, or paid over to it for the purposes above specified. *The board may be sued in the district court of the United States for the District of Columbia, which is hereby given jurisdiction of such suits, for the purpose of enforcing the provisions of any trust accepted by it.*" Act of March 3, 1925, c. 423, § 3, 43 Stat. 1108, as amended January 27, 1926, c. 6, 44 Stat. 2, June 25, 1936, c. 804, 49 Stat. 1921, 2 U.S.C.A. § 159. (Emphasis added.)

Is the present suit authorized by the provision just quoted? If it is not, the District Court is without jurisdiction in the matter. For this is, as the appellant concedes, a suit against the United States, and express statutory authority must be found

for its maintenance.[1] In the statute creating the Board, Congress provided simply and solely that 'suit could be brought against the Board "for the purpose of enforcing the provisions of any trust accepted by it." The meaning of that provision seems clear. The statute was passed to encourage the public to make gifts to the Library of Congress, and to assure donors that if the Board did not carry out the provisions of a trust accepted by it (e. g., the establishment of a special collection in the name and memory of an individual), the aid of the courts could be invoked in enforcing the terms of the gift, as accepted. Provisions of this kind serve an obvious purpose, and a definite need.

█ "We have no doubt that the receipt of gifts, testamentary and nontestamentary, is within the ambit of federal powers. Uninterrupted usage from the foundation of the Government has sanctioned it." United States v. Burnison, 339 U.S. 87, 70 S.Ct. 503, 505. But gifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress. The national legislature, which controls the property of the United States (Const. Art. IV, Sec. 3), is consulted in such a case. And Congress has on many occasions not only accepted conditional gifts, but has provided means for the future acceptance and encouragement of special gifts to be devoted to particular purposes. We have collected in an appendix to this opinion some of the

statutes in this field. It will be seen that in some instances Congress has been content to provide that the accepting and administering officials shall observe the terms and conditions of the gift.[2] In others, it has gone farther, and provided means whereby the donor can through court action compel the administering official or agency to observe the terms and conditions of an accepted gift.

Under the statute here in issue, Congress gave donors to the Library of Congress Trust Fund definite assurance that judicial remedies would be available to compel the Trust Fund Board to observe the conditions of an accepted gift. But could Congress have meant, through this simple statutory promise, to furnish third party creditors of the Board with a remedy against the very trust funds which Congress was solemnly undertaking to devote to a specified public use? Or a remedy against the public treasury?

█ "The United States, as sovereign, is immune from suit save as it consents to be sued * * * and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. * * * [And] consent, since it is a relinquishment of a sovereign immunity, must be strictly interpreted." United States v. Sherwood, 312 U.S. 584, 586, 590, 61 S.Ct. 767, 769, 85 L.Ed. 1058, per Stone, J. The basis for this is not far to seek. Whatever out-moded reasons may have been given in the past for the immunity of the sovereign,[3] it is through harsh necessity

---

1. After conceding that the present suit is against the United States, appellant's brief argues that "the Government has consented that its agency, the Library of Congress Trust Fund Board, be sued in the District Court in an action of this character. The sole question presented on this appeal is the construction to be placed upon the Act of Congress which created the Board."

2. For example, Congress has expressly confirmed the authority of the Librarian of Congress to accept gifts of money for immediate disbursement for purposes beneficial to the Library, but without providing that he shall be subject to suit. 2 U.S.C.A. § 160. That provision occurs

in the very act creating the Library of Congress Trust Fund Board. In contrast, the Trust Fund Board, which is given the function of administering gifts or bequests requiring more extensive management, is made amenable to suit for the purpose of "enforcing the provisions" of an accepted trust. 2 U.S.C.A. § 159.

3. Originally the rule may have been based upon a theory that the state (King) could do no wrong. A further reason was the supposed indignity to the state of being sued without its permission. It has also been suggested that "there can be no legal right as against the authority that makes the law on which

that the legislature in a democratic community today retains ultimate control over public funds. If the Treasury were subject to the multifarious claims which may arise against the Government without the necessity of prior Government consent to suit, the Treasury could be depleted and governmental policy hampered. Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209; Great Northern Life Insurance Co. v. Read, supra, 322 U.S. at page 53-54, 64 S.Ct. at page 876; Nichols v. United States, 7 Wall. 122, 126, 74 U.S. 122, 126, 19 L.Ed. 125; United States v. Lee, supra, 106 U.S. at pages 223, 226, 1 S.Ct. at pages 263, 265 (dissenting opinion). The interest of the citizen in obtaining redress against the Government is thus balanced against the need to protect the revenues and property of the United States.

The Library of Congress is, of course, an agency rendering service primarily to the legislative branch, though also to the other branches, of the United States Government. The Board was established to carry out a definite public purpose; it provides a means of supplementing the funds appropriated to the Library from the Treasury. Congress has retained close supervisory control over both the Library and the Board; both are its creatures and instruments. We must presume that the funds donated to and administered by the Board have been stamped by Congress with the characteristics of funds devoted to a public use. The same reasoning that precludes direct recovery against the general funds of the Treasury operates to preclude recovery against the specialized funds in the hands of the Board, in the absence of legislative consent. To impose liability upon the members of the Board in cases such as this involves either (1) personal liability of the members, which is not sought (and could hardly be sought) in this case, or (2) the obtaining from Congress of an appropriation of funds from the Treasury (Const. Art. I, § 9), or (3) the diversion of funds in the possession of the Board, possibly even funds previously dedicated to a different public use by some other donor. The practical difficulty which any of these possibilities would entail makes clear the necessity of having suits for damages against the United States or its agencies subject to legislative control. Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209, citing Ex parte State of New York, 256 U.S. 490, 500, 502, 41 S.Ct. 588, 65 L.Ed. 1057. Accordingly, "Congress, not this Court or the other federal courts, is the custodian of the national purse." United States v. Standard Oil Co., 332 U.S. 301, 314, 67 S.Ct. 1604, 1611, 91 L.Ed. 2067. And, however the cause of action here involved is framed, in substance it is a suit for money damages for breach of contract against a Government agency administering funds for the benefit of the United States.

Appellant thus is faced with the burden of showing that the statute establishing the Library of Congress Trust Fund Board grants jurisdiction to the District Court sufficient in scope to sustain the present litigation. We have noted that the statute in terms grants jurisdiction of suits against the Board "for the purpose of enforcing the provisions of any trust accepted by it." In arguing that the present suit is brought for that purpose, appellant contends that the Board has the obligation to administer the property held by it; the right and obligation to determine the investment and reinvestment of the property, including the right to sell; as well as "the usual powers and obligations" of trustees with respect to the sale of property. Appellant argues that these powers and obligations must necessarily include authority for the giving of deeds and other instruments and payment of any brokerage or other expenses

---

the right depends." Holmes, J., in Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834. Modern concepts of how society is organized and the purpose of the state are making such theories increasingly un-

tenable. Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 57, 59, 64 S.Ct. 873, 88 L.Ed. 1121 (Frankfurter, J., dissenting); United States v. Lee, 106 U.S. 196, 204–206, 1 S.Ct. 240, 27 L.Ed. 171.

incident to a sale.[4] "The power to sell without the power to pay expenses of a sale," so runs appellant's argument, "would be a barren power, and such a barren power is not to be implied in the absence of specific congressional language to that effect."

The difficulty with this contention is that no one has questioned the power of the Board to make a sale, and presumably to take all necessary action in connection with the completion of the sale.[5] The question at bar is whether the District Court for the District of Columbia has any jurisdiction to entertain the present suit against the Board, seeking recovery of a real estate commission; that is, whether the District Court has jurisdiction to compel payment by the Board. Whether or not the Board has power to pay a commission voluntarily has but little bearing upon the jurisdictional question raised here.

Plaintiff makes the further argument that as a creditor of the trust estate he is entitled to sue in the District Court "for the purpose of enforcing the provisions of the statutory trust, under the circumstances of this case." Plaintiff cites a number of authorities for the proposition that a trust estate can be made responsible for contracts properly made by the trustee in the administration of the trust in cases where adequate relief cannot be obtained by an action brought against the trustee personally. Peyser v. American Security & Trust Co., 70 App.D.C. 349, 107 F.2d 625; 2 Scott, Trusts, sec. 271A.1, pp. 1530–31 (1939); 1 Williston, Contracts, sec. 313 (Rev. ed.

1936); Newby v. Kingman, 1941, 309 Ill. App. 36, 32 N.E.2d 647. But there is a distinction between a suit to enforce a trust and one to reach the assets of a trust estate for liabilities incurred during its administration. The former is concerned with insuring proper execution of the provisions of the trust, the latter with obtaining recompense for dealings with the trustees. Compare Restatement, Trusts, §§ 200, 391 *with* §§ 266–71. The right of a creditor "is not dependent on any power the trustee may or may not have under the terms of the trust * * *" but "arises by operation of law. * * *." 1 Williston, Contracts § 313 (Rev. ed. 1936). Appellant, however, argues that the trust he seeks to enforce is a "statutory trust," that implicit in the grant of power to the trustees is the imposition of a duty to pay valid claims against the Board. But to speak of enforcing a "statutory trust" in a suit against the United States Government is to play on words, and to prove too much. Every public officer is in the larger sense a trustee, subject to the obligation to carry out the duties which Congress has placed upon him. What section 3 of the statute (2 U.S.C.A. § 159) is talking about is something far more specific—as we have endeavored to show.

Plaintiff has stated a case having considerable moral and sympathetic appeal. We have carefully considered the arguments he has advanced. But the fact remains that to permit plaintiff to maintain suit here would be in effect to amend section 3 by adding to it the words "for the

---

4. Citing McLean v. Peyser, 1935, 169 Md. 1, 179 A. 58, and In re Duffy's Will, 1941, 230 Iowa 581, 298 N.W. 849.

5. Both parties agree that whether or not the Board had the power to incur brokerage expenses is dependent upon the terms of the trust instrument under which the Board received the property here in question; both agree that the instrument specifically provides that the Board may sell the property "upon such terms * * * as it may in its absolute discretion deem advisable." In view of these provisions and those of the statute creating the Board (2 U.S.C.A. § 159), and having in mind that a trustee can properly incur expenses in employing brokers if "rea-

sonably necessary in the administration of the trust" (Restatement, Trusts, § 188c), it seems clear that the Board had the power to enter into a brokerage arrangement. We may note that the two main statutes relating to disposal of real property belonging to the Government empower the agencies in charge of such sales either to pay brokers' fees (40 U. S.C.A. §§ 304a, 304a—1), or to pay the reasonable and necessary expenses of sale (40 U.S.C.A. §§ 74a–74c). While these statutes do not govern sale of the realty here in question, they support the conclusion that the Board has the power to incur brokerage expense when necessary to the performance of its functions.

purpose of enforcing payment of any liability incurred by the Board in the course of its authorized activities." It is not within the judicial function to rewrite a statute so that it will authorize what the court thinks should be authorized.

■ Where Congress has authorized the formation of a business corporation, to be owned and operated by the Government, and has empowered it to "sue and be sued," consent to maintenance and defense of suit has been found. See Keifer & Keifer v. R. F. C., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784. The reasoning of such cases is, of course, readily distinguishable from the present situation.[6] Here there is no general "sue and be sued" clause, but instead, a limited grant of jurisdiction. Nor was the defendant Board ever "launched * * * into the commercial world" within the meaning of the cases under reference. See Federal Housing Administration, Region No. 4 v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724. And whether or not sovereign immunity should be applied, as a matter of policy, is no longer an open question. While the rule has been the subject of considerable criticism (R. F. C. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 580, 581, 66 S.Ct. 745, 90 L.Ed. 862 (Frankfurter, J., dissenting); Keifer & Keifer v. R. F. C., supra, 306 U.S. at page 390–391, 59 S.Ct. at pages 518–519), it is too firmly entrenched in our system of law to be discarded by judicial fiat. It has been an assumed premise upon which much legislation has been predicated. The Congress has never seen fit to subject the Treasury of the United States to the possibility of unlimited liability through litigation. The leading statute in this field is, of course, the Tucker Act, 28 U.S.C.A. §§ 1346(a), 1491. We make no comment as to the possibility that plaintiff in this case may be able to recover by a suit in the Court of Claims under that or any other act. We cite the Tucker Act simply to indicate the nature of the special provisions which Congress has seen fit to make in the leading grant of legislative authority for such suits.

If the Congress has not in its many provisions for suit against the United States provided an appropriate remedy for the plaintiff-appellant, then it is the province of the Congress and not the courts to grant such relief. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 704–705, 69 S.Ct. 1457, 93 L.Ed. 1628.

We may add one further comment. As has been noted, plaintiff has conceded that this is a suit against the United States. There is nothing before us which would indicate that this concession was not justified, or in fact that it was not a virtual necessity. While the original trust agreement, by which the Library of Congress was granted the property here involved, is not in the record in this case, part of that agreement has been quoted in a published opinion of the Attorney General, 40 Op.Atty.Gen. 66. There is a suggestion (not, however, briefed or argued by the plaintiff) that we should evolve from that source a theory upon which to sustain this suit: namely (if we understand it correctly), that the Trust Fund Board received the realty solely for the purpose of sale; that the realty was not held in trust for the Library of Congress or any other governmental beneficiary; that upon the sale of the realty half the net proceeds was to be paid to the Smithsonian Institution and the other half of the net proceeds was to be held in trust for the benefit of the Library of Congress; that the donor used the term "net proceeds"

---

6. Mr. Justice Frankfurter in Keifer & Keifer v. R. F. C., supra, said: "The Congressional will must be divined, and by a process of interpretation which, in effect, is the ascertainment of policy immanent not merely in the single statute from which flow the rights and responsibilities of Regional [the corporation whose suability was in question], but in a series of statutes utilizing corporations for governmental purposes * * *." 306 U.S. at page 389, 59 S.Ct. at page 518.

Similarly, the congressional intent in this case must be divined by ascertaining the policy immanent in the whole series of statutes relating to the acceptance of conditional gifts by agencies of the United States Government. (See Appendix)

with the specific intent that the difference between the net proceeds of sale and the gross proceeds of sale should constitute a separate trust fund; that the plaintiff here was in fact the beneficiary of that trust fund for which there was no Government beneficiary; that therefore the Board had no rightful claim to such funds; and that under the rule of Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209, the suit could be maintained as not being one against the United States.

We have carefully considered this line of argument. We find ourselves unable to adopt it as the basis of decision here. Land v. Dollar was a suit against Government officials in which the right to certain securities was in issue. The Supreme Court held that the District Court had jurisdiction to determine whether either of plaintiff's basic factual contentions was correct: (1) that the defendants had taken possession of the securities merely as collateral for a Government loan (in which case, the loan having been repaid, the defendants were wrongfully withholding property in which the United States had no interest), or (2) that the defendants had sought to take absolute title to the securities on behalf of the United States, but lacked authority (in which event, the suit was maintainable as against officers withholding property in excess of their statutory powers). On either theory, the claim in Land v. Dollar rested upon the right "under general law to recover * * * specific property wrongfully withheld." (Id., 330 U.S. at page 736, 67 S.Ct. at page 1011). Accordingly, the cause was remanded to the District Court for determination of the basic facts, since resolution of the question of ownership of the shares would determine whether or not the suit was one against the United States; and thus whether the District Court had jurisdiction. The court emphasized the point that "If ownership of the shares is in the United States, suit to recover them would of course be a suit against the United States." (Id., 330 U.S. at pages 738–739, 67 S.Ct. at page 1013.

Here, on the other hand, plaintiff can make no claim, and in fact makes no claim, against any specific property in the Board's hands. He is suing for a money judgment —to be collected, presumably, from any available source of funds. The Attorney General's opinion above mentioned contains only brief passages from the original trust agreement. If we rely on these as being the only ones pertinent to the present case (the Attorney General having had an entirely different issue before him), we conclude, contrary to the theory outlined above, that the Board received the realty in trust for the benefit of the Library of Congress and the Smithsonian Institution, for the donor recognized and dealt with the possibility that some time might elapse before the sale took place and that income from the property would be realized during that period. But in any event it is clear that before the sale the present plaintiff had no possible interest in any specific property held by the Board. And, after the sale, the only property which conceivably could be claimed was the fund which constituted the proceeds of the sale. What possible claim of interest can this plaintiff make to any part of those funds? Certainly not legal title. Nor do we find anything in the published portions of the trust instrument which would earmark special funds for the benefit of the plaintiff or of any other creditor. The donor of the property no doubt contemplated that the Board would pay the expenses of sale from the proceeds. But there is a patent distinction between the authorization of such action and the setting up of an express trust to insure payment, for the benefit of creditors. The Board was specifically empowered to sell the property under such terms and conditions as it saw fit. The donor's reference to net proceeds of sale has obvious reference to the probability that the Board would incur expenses in selling, and would prefer to pay them from the proceeds of sale. Authorization is not compulsion. We can hardly construe a mere reference to "net proceeds" as both manifesting and executing an intent to set up an express trust for the benefit of such creditors as the plaintiff.

■ We must therefore conclude that the Board's failure to pay obligations incurred is in no sense a withholding of plaintiff's property, for the Board at no time

has had property which belongs legally or beneficially to the plaintiff. Land v. Dollar is thus inapplicable.[7] The Supreme Court pointed out in that case that the suit there was not "an indirect attempt to collect a debt from the United States * * *" nor "an attempt to get specific performance of a contract to deliver property of the United States." Id., 330 U.S. at page 737, 67 S.Ct. at page 1012. The basis of the action was that the Government officials were tort-feasors, unlawfully holding a citizen's chattels. It was on that basis that the claimant was "not relegated to the Court of Claims to recover a money judgment." Id., 330 U.S. at page 738, 67 S.Ct. at page 1012. Here, as we have noted, what is sought is not specific realty or chattels nor even specific funds. This is nothing other than a suit against the United States, to recover a money judgment. As such, whatever its merits may be in other respects, it is not a suit for the "purpose of enforcing the provisions of any trust accepted" by the Board, within the meaning of the controlling statute.

The District Court correctly found that it lacked jurisdiction of this case, and its judgment is accordingly

*Affirmed.*

APPENDIX
Typical Statutes Regulating Acceptance of Special Gifts By Agencies Of The United States.

1. Statutes authorizing the agency accepting the gift to sue and be sued in general terms:

> 16 U.S.C.A. § 468c, act of Oct. 26, 1949, c. 755, § 4, 63 Stat. 928 (National Trust for Historic Preservation in the United States—a corporate body)

2. Statutes authorizing suit for the purpose of enforcing the terms and conditions of the gift:

> 2 U.S.C.A. § 159, act of Mar. 3, 1925, c. 423, § 3, 43 Stat. 1108, as amended by the act of Jan. 27, 1926, c. 6, § 1, 44 Stat. 2; act of June 25, 1936, c. 804, 49 Stat. 1921. (Library of Congress Trust Fund)
>
> 5 U.S.C.A. § 228, act of July 2, 1945, c. 228, § 5, 59 Stat. 317, as amended by act of June 26, 1947, c. 343, Title II, § 205(a), 61 Stat. 501 (Kermit Roosevelt Fund)
>
> 16 U.S.C.A. § 19b, act of July 10, 1935, c. 375, § 3, 49 Stat. 478, as amended by the act of June 25, 1936, c. 804, 49 Stat. 1921 (National Park Trust Fund)

3. Statutes directing that the terms and conditions of the gift be complied with, but not specifically authorizing suit to compel compliance:

> 2 U.S.C.A. § 160, act of March 3, 1925, c. 423, § 4, 43 Stat. 1108 (Gifts of money to the Librarian of Congress for the benefit of the Library)
>
> 22 U.S.C.A. § 809, act of Aug. 13, 1946, c. 957, Title X, § 1021, 60 Stat. 1031 (Gifts for the benefit of the Foreign Service)
>
> 24 U.S.C.A. § 181, act of Nov. 7, 1941, c. 469, § 1, 55 Stat. 760 (Gifts for the benefit of St. Elizabeth's Hospital)
>
> 34 U.S.C.A. § 1115a, act of Mar. 31, 1944, c. 147, § 2, 58 Stat. 135 (Gifts for the benefit of the Naval Academy)
>
> 38 U.S.C.A. § 14b, d, act of July 16, 1946, c. 579, §§ 3, 5, 60 Stat. 538; (Gifts for the benefit of veterans)

---

7. And so, a fortiori, are the cases underlying Land v. Dollar; for example United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171, which was a suit in ejectment against Government officers withholding plaintiff's property "without lawful authority, without process of law and without compensation." Id., 106 U.S. at page 221, 1 S.Ct. at page

261. See, also, Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, a suit brought "to enjoin the Secretary of the Interior from enforcing an order, the wrongful effect of which will be to deprive respondents of vested property rights * * *." Id., 300 U.S. at page 96, 57 S.Ct. at page 417.

42 U.S.C.A. § 219, act of July 1, 1944, c. 373, Title V, § 501, 58 Stat. 709, as amended by act of July 3, 1946, c. 538, § 10, 60 Stat. 425, act of June 16, 1948, c. 481, § 6(b), 62 Stat. 469 (Gifts for the benefit of the Public Health Service)

44 U.S.C.A. § 300ee, act of July 9, 1941, c. 284, § 5, 55 Stat. 581, as amended by act of June 30, 1949, c. 288, Title I, § 104, 63 Stat. 381 (National Archives Trust Fund)

4. Statutes authorizing acceptance of gifts with no reference to conditional gifts:

5 U.S.C.A. § 393, act of Aug. 8, 1946, c. 876, §§ 1-3, 60 Stat. 924 (Gifts for the benefit of the Post Office Library)

5 U.S.C.A. § 721, act of May 22, 1920, c. 195, § 8, 41 Stat. 618, act of July 3, 1926, c. 801, § 10, 44 Stat. 910, act of May 29, 1930, c. 349, § 10, 46 Stat. 475 (Gifts for the benefit of civil service employees)

16 U.S.C.A. (Gifts for the benefit of various national memorials and national parks)

§ 111b, act of Feb. 26, 1931, c. 308, § 2, 46 Stat. 1423

§ 159a, act of June 1, 1938, c. 316, § 2, 52 Stat. 609

§ 179, act of July 1, 1916, c. 209, § 1, 39 Stat. 308, act of June 12, 1917, c. 27, § 1, 40 Stat. 151

§ 231b, act of Aug. 10, 1939, c. 640, § 3, 53 Stat. 1342

§ 263, act of June 11, 1940, c. 304, § 3, 54 Stat. 263

§ 361e, act of June 15, 1936, c. 554, § 3, added Aug. 10, 1939, c. 639, 53 Stat. 1342

§ 403e, act of Feb. 4, 1932, c. 19, § 2, 47 Stat. 37

§ 404e, act of May 14, 1934, c. 282, § 2, 48 Stat. 775

§ 408a, act of March 3, 1931, c. 448, § 2, 46 Stat. 1514

§ 409a, b, act of Mar. 2, 1933, c. 182, §§ 2, 3, 47 Stat. 1421, 1422

§ 422a—1, act of Sept. 27, 1944, c. 417, 58 Stat. 746

§ 423a, d, act of July 3, 1926, c. 746, §§ 2, 5, 44 Stat. 822, Ex. Ord. No. 6166, § 2, June 10, 1933, Ex. Ord. No. 6228, § 1, July 28, 1933

§ 424a, act of May 4, 1934, c. 218, § 1, 48 Stat. 666

§ 424a—1, act of Mar. 5, 1942, c. 148, § 1, 56 Stat. 133

§ 425a, e, act of Feb. 14, 1927, c. 127, §§ 2, 6, 44 Stat. 1092, 1093, Ex. Ord. No. 6166, § 2, June 10, 1933, Ex. Ord. No. 6228, § 1, July 28, 1933

§ 428d—2, act of Aug. 30, 1937, c. 888, § 2, 50 Stat. 882

§ 430h—1, act of Oct. 9, 1940, c. 790, 54 Stat. 1061

§ 430k, act of June 21, 1934, c. 694, § 2, 48 Stat. 1199

§ 430o, act of Mar. 2, 1934, c. 38, § 1, 48 Stat. 389, act of June 21, 1934, c. 694, § 6, 48 Stat. 1199

§ 430u, act of June 26, 1935, c. 315, § 2, 49 Stat. 423

§ 433c, act of June 2, 1936, c. 477, § 3, 49 Stat. 1394

§ 450aa, act of July 14, 1943, c. 238, § 1, 57 Stat. 563

§ 450bb, act of June 30, 1944, c. 328, § 1, 58 Stat. 645

§ 459a, act of Aug. 17, 1937, c. 687, § 2, 50 Stat. 669, act of June 29, 1940, c. 459, § 1, 54 Stat. 702

24 U.S.C.A. § 45, R.S. § 4819, act of June 12, 1906, c. 3078, 34 Stat. 242, act of May 11, 1908, c. 163, 35 Stat. 110 (Gifts for the benefit of the Soldiers Home)

34 U.S.C.A. § 1118, act of Mar. 26, 1938, c. 52, § 3, 52 Stat. 119 (Gifts for the benefit of the United States Naval Academy Museum)

38 U.S.C.A. § 11b, act of July 3, 1930, c. 863, § 3, 46 Stat. 1016 (Gifts for the benefit of the United States to clear its title to property formerly held by the National Home for Disabled Volunteer Veterans)

38 U.S.C.A. § 13a(h), Reorganization Plan No. 2 of July 16, 1946, § 3, 11 F.R. 7873, 60 Stat. 1095, act

of Aug. 7, 1946, c. 791, § 2, 60 Stat. 888, act of May 21, 1949, c. 133, §§ 1, 2, 63 Stat. 73 (Gifts for the benefit of the Veterans Canteen Service)

5. Legislation respecting certain individual gifts:

16 U.S.C.A. §§ 211, 212, act of July 17, 1916, c. 247, §§ 1, 2, 39 Stat. 385 (Abraham Lincoln National Historical Park—Gift from Lincoln Farm Association)

20 U.S.C.A. § 74, act of Mar. 24, 1937, c. 50, § 4, 50 Stat. 52, as amended by act of Apr. 13, 1939, c. 61, 53 Stat. 577 (National Gallery of Art—Gift of A. W. Mellon)

Act of Aug. 10, 1846, c. 178, 9 Stat. 102 (Smithsonian Institute—original gift from James Smithson)

Joint Resolution of June 22, 1938, c. 595, 52 Stat. 943 (home of Oliver Wendell Holmes—bequest of Oliver Wendell Holmes)

Joint Resolution of July 18, 1939, c. 324, 53 Stat. 1062 (Franklin Delano Roosevelt Library—gift of Franklin Delano Roosevelt)

WILBUR K. MILLER, Circuit Judge (dissenting).

This case went off in the United States District Court on a motion to dimiss, which of course admitted all facts well pleaded in the complaint. Those facts are: The appellees, who are the members of the Library of Congress Trust Fund Board, on or about September 28, 1945, authorized and empowered the appellant, a licensed real estate broker, to act as the Board's agent in offering for sale certain valuable real estate in the District of Columbia, which the Board had the right and power to sell and convey. Pursuant to this employment, the appellant offered the property to one Eric Johnston, a representative of the Motion Picture Association of America, Inc. Mr. Johnston expressed interest. Appellant had floor plans prepared which he submitted to the prospect. He conducted the Association's representatives through the building and negotiated with them for its sale. They asked appellant to ascertain the lowest price at which the property could be bought. He asked the question of the Board, giving the name of his prospect, and was told the price was $600,000. He passed the information on to the Association. Appellant kept the Board informed of the progress of his negotiations, but on or about January 1, 1946, and while Story was still negotiating with the prospective purchaser, the Board sold and conveyed the property to the Motion Picture Association for $600,000, but did not inform the appellant. Although Story was the procuring cause of the sale, the Board has refused to pay him the sum of $19,000, which is the usual and customary commission and which would be fair and reasonable compensation. Such is the unconscionable conduct which the unanswered complaint attributes to the appellees.

The members of the Board may have had some affirmative reason for refusing to pay Story, or they may have been advised by counsel that they lacked legal authority to do so. However that may be, when the Board was placed in the position of admitting, by the motion to dismiss filed in its behalf, that it had employed the broker and had availed itself of his services and then had sold to his prospect without informing him and had subsequently refused, without any reason, to pay him any compensation at all, its position was indefensible morally and, I think, legally. The motion to dismiss conceded flagrant bad faith on the part of the Board.[1]

The majority of the court have found this to be a suit against the United States to which it has not consented, and for that reason have affirmed the District Court in dismissing for lack of jurisdiction. I am unable to agree for two reasons: (a) I do not think this is an action against the United States, and (b) if it is, I think Congress consented, in § 3 of the Act,[2]

1. The court's opinion goes so far as to say, "Plaintiff has stated a case having considerable moral and sympathetic appeal."

2. 43 Stat. 1107 (1925), 44 Stat. 2 (1926), 49 Stat. 1205, 1894, 1921 (1936), 56 Stat. 765 (1942), 2 U.S.C.A. §§ 154–163.

for the Board to be sued in circumstances such as those disclosed here.

The appellant, in his brief, concedes his suit to be against the government, and argues it was permitted by the statute. The concession does not establish the fact and was improvidently made, as I shall demonstrate—at least to my own satisfaction. But even if appellant correctly conceded this to be an action against the United States, I think his argument that Congress gave its consent to the institution of such a suit is sound and should be upheld.

It may be presumed, I suppose, that the conception of this case as one against the United States is based on the idea that the plaintiff sought to subject to his debt a trust estate of which the government itself, through its agencies, the Library of Congress and the Smithsonian Institution, is the *cestui que trust*;[3] and that the action would not be thought of as one against the United States merely because the defendants constituted the Library Trust Fund Board, which is a government agency, if as a matter of fact recovery was sought from funds in the Board's hands of which no federal agency was the beneficial owner.

The nature of the gift to the Board which is involved in this case is, therefore, of prime importance in determining whether the plaintiff-appellant was attempting to reach a fund held in trust for the government. Although it is not in the record, fortunately we have access to salient paragraphs of the trust agreement[4] which are quoted in an opinion of the Attorney General (40 Op.Atty.Gen. 66) of which we may take judicial notice.[5]

These paragraphs are:

"As a memorial to my father, Henry Kirke Porter, it is my pleasure to tender to the Library of Congress Trust Fund Board the conveyance of the parcels of land owned by me at the corner of Sixteenth and I Streets in the City of Washington, District of Columbia, as a gift, upon an agreement that when the property is sold one-half of the net proceeds of such sale will be added to the permanent invested funds held by your Board as trustees for the Library of Congress. * * * I authorize the Library of Congress Trust Fund Board to sell said property at such time or times and upon such terms or conditions as it may in its absolute discretion deem advisable.

"When a sale of the property is made by your Board, I direct your Board to pay over to the Smithsonian Institution, of Washington, D. C., the remaining one-

---

3. This seems borne out by this excerpt from the court's opinion: "* * * We must presume that the funds donated to and administered by the Board have been stamped by Congress with the characteristics of funds devoted to a public use. The same reasoning that precludes direct recovery against the general funds of the Treasury operates to preclude recovery against the specialized funds in the hands of the Board, in the absence of legislative consent."

I suggest that we must *not* presume that funds *not* donated to the Board (such as the sum of $19,000 here in question) "have been stamped by Congress with the characteristics of funds devoted to a public use."

4. What I refer to as the "trust agreement" is the written offer of the donor, dated December 20, 1938, which was formally accepted by the Board on December 22, 1938. The subsequent conveyance by the donor was subject to the conditions expressed in the accepted of-

fer, and whatever power the Board received to deal with the real estate was limited by those conditions.

5. That we may do so seems settled. Bowles v. United States, 1943, 319 U.S. 33, 35, 63 S.Ct. 912, 87 L.Ed. 1194; Jackson v. United States, 1913, 230 U.S. 1, 18, 19, 33 S.Ct. 1011, 57 L.Ed. 1363; The Paquete Habana, 1900, 175 U.S. 677, 696, 20 S.Ct. 290, 44 L.Ed. 320; Heath v. Wallace, 1891, 138 U.S. 573, 584, 11 S.Ct. 380, 34 L.Ed. 1063; Fletcher v. Jones, 1939, 70 App.D.C. 179, 182–183, 105 F.2d 58, 61–62, certiorari denied, 1939, 308 U.S. 555, 60 S.Ct. 116, 84 L.Ed. 467; Red Canyon Sheep Co. v. Ickes, 1938, 69 App.D.C. 27, 31, 98 F.2d 308, 312; Thorsch v. Miller, 1925, 55 App.D.C. 295, 5 F.2d 118; Quapaw Land Co. v. Bolinger, 5 Cir., 1929, 32 F.2d 627, 629, reversed on other grounds 1930, 281 U.S. 693, 50 S.Ct. 244, 74 L.Ed. 1122; United States v. Brewer-Elliott Oil & Gas Co., D.C.W.D.Okl.1918, 249 F. 609, 619.

half of the net proceeds of such sale, to be applied by the Smithsonian Institution for such purposes as I have designated to it in a formal offer contained in my letter to the Institution bearing the date of this letter * * * "

For several reasons, it is apparent the donor intended the realty to be sold: (1) Her offer, quoted above, twice referred to "when the property is sold" but never to "if it is sold" (2) She dictated the disposition of the net proceeds of the sale of the property, a provision inconsistent with an absolute and unqualified gift of realty as such. (3) The donor placed only one-half of the property's net proceeds permanently in trust for the benefit of the Library, and directed the Board to *pay* the other half to the Smithsonian; as the property was not susceptible of division, this could be accomplished only by a sale. These considerations amply demonstrate that the donor gave the real estate, not to be retained by the Board, but to be sold so the net proceeds might be divided in accordance with her directions.

Since it was to be sold, the realty itself was not to be held in trust for the Library and the Smithsonian. But the donor did not place the gross proceeds of sale in trust for the two institutions. The trust agreement twice refers to the net proceeds of the sale, and directs that one-half of the net be held in permanent trust for the Library, and the other half of the net be *paid* to the Smithsonian. It should be noted that the Board accepted those instructions and agreed to handle the net proceeds in that fashion. This is seen in the fact that the offer to convey was "upon an agreement that when the property is sold, one-half of the net proceeds of such sale will be added to the permanent invested funds held by your Board as trustees for the Library of Congress", and that the other one-half of the net proceeds of the sale should be paid to the Smithsonian Institution. The Board accepted the gift upon that agreement.

We must suppose this generous donor understood the meaning of the term "net proceeds of such sale", which she twice employed in describing her gift to the two

institutions, and that she used the words advisedly. The trust agreement should, therefore, be construed in the light of the plain meaning of the expression "net proceeds of such sale". The donor knew, of course, that the net proceeds would be the sale price diminished by the expense of selling, so in repeating the words "net proceeds", she in effect authorized and directed the Board to pay the cost of selling the property out of the gross proceeds. The difference between the gross and the net proceeds (which in this case, as far as we can ascertain from the record, is the broker's commission of $19,000) was not to go to either named beneficiary, according to the terms of the trust instrument.

If the Board has divided the gross sum of $600,000 between the two *cestuis que trust,* it has done so contrary to strict instructions to divide only the net; its act in so doing, if it has done so, amounts to an unauthorized seizure of $19,000 to place in the two trust funds. On the other hand, if the Board has followed instructions and has divided only the net proceeds between the two beneficiaries, in what fund and for what purpose is it holding the item of brokerage expense in the sum of $19,000? What did the donor want done with it?

The donor also knew that authorizing the Board to sell the property would result in bringing the gross proceeds of the sale temporarily into the Board's hands. Yet she placed only the net proceeds in trust for the Smithsonian and the Library. Obviously she expected the Board to pay the expense of selling from the gross proceeds. It follows that the sum of $19,000 (the difference between the gross and the net) was received by the Board for the specific purpose of paying the brokerage commission. That being true, the sum is impressed with a trust in favor of the broker, which the Board should be required to honor.

In the present posture of the case, i. e., on a motion to dismiss, it would beg the question, and would anticipate a decision on the merits of the case, should the Board argue it does not owe the appellant $19,000 or any sum, that it incurred no such brokerage expense, and that the entire sum of $600,000 was therefore net proceeds.

The motion to dismiss admits that the Board does owe appellant $19,000, that it did incur brokerage expense in that amount, and that the net proceeds of sale amounted to $581,000 and not to $600,000.

It is therefore my view that only the sum of $581,000, which was the net proceeds, was received in trust for the Library and the Smithsonian; that the remaining sum of $19,000, the appellant's commission, was received by the Board in trust for him; that that sum of $19,000 (by which the net proceeds differed from the gross) was not given by the donor either for the benefit of the Library or for payment to the Smithsonian, from which it follows that neither institution ever became beneficially entitled to that sum or any part of it. Nor was it given to the Board to be retained for any purpose. The consequence is that the sum which appellant sued for is a fund which does not belong to any government agency, actually or beneficially, and that this action is, therefore, not against the United States. Substantially to that effect was the holding of this court in Dollar v. Land, 1946, 81 U.S.App.D.C. 28, 154 F.2d 307, affirmed 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209.

But if the suit be thought of as one against the government on the mere ground that the Board is a federal agency, nevertheless, the District Court erred, as I think, in dismissing the complaint for lack of jurisdiction. For § 3 of the Act, even under the narrow construction given it in the majority opinion, authorized the appellant to maintain his action. He was a creditor, to be sure; but he was a creditor of the Board and not of either of the two trust funds set up in the trust agreement. And while the appellant was a creditor of the Board, he was something more than an ordinary unsecured creditor. He was in a favored position because the donor had earmarked for his benefit enough of the gross proceeds of the sale to pay his commission and, in effect, had directed the Board to pay him that sum. So, in equity and good morals, which are much the same, the Board received $19,000 for the broker's use and benefit, and not at all for either of the express trusts, nor for its own purposes. In suing to recover the money, the appellant was no mere creditor who sought to collect a debt; he was the beneficiary of an equitable trust, asking the court to enforce its provisions. If that be true, and I think it is, it must be conceded that § 3 of the Act is congressional consent to such an action against the Board.

If we go a step further, and concede arguendo that the gross sum of $600,000 was in trust for the two governmental beneficiaries, that there was no equitable trust impressed on $19,000 of the sale price in favor of the appellant, and that, in consequence, this is a suit against the United States, it still seems to me the District Court erred in disclaiming jurisdiction. Even in those circumstances, § 3 of the statute construed as a whole amounts, in my opinion, to a consent by Congress that the Board be sued. The whole tenor of § 3 is to that effect. There are only two sentences in it. The first is that the Board shall have "all the usual powers and obligations of a trustee" with respect to all money and property received by it. The second sentence is, the Board may be sued in the District Court "for the purpose of enforcing the provisions of any trust accepted by it."[6] One of the usual obliga-

---

6. The majority rhetorically ask, "* * * could Congress have meant, through this simple statutory promise, to furnish third party creditors of the Board with a remedy against the very trust funds which Congress was solemnly undertaking to devote to a specified public use? Or a remedy against the public treasury?"

It seems to me the questions are not relevant. This sum of $19,000 is not a part of "the very trust funds which Congress was solemnly undertaking to devote to a specified public use". Nor is the remedy sought here against the public treasury; consequently, the following statement of the majority is inapposite:

"* * * If the Treasury were subject to the multifarious claims which may arise against the Government without the necessity of prior Government consent to suit, the Treasury could be depleted and governmental policy hampered."

tions of a trustee is to pay his debts. Congress imposed that obligation on the Board. Yet the Board has refused to pay and the court has sustained it by holding that a suit to enforce this statutory obligation is not for the purpose of enforcing the provisions of the trust.

I can imagine the surprise of the members of Congress who passed the Act if they were told how it is being construed. They imposed the obligation but, it is said, gave the obligee no way to enforce it. Regardless of the rule that only a beneficiary may sue to enforce the provisions of a trust, I think the second sentence of § 3 is related to the first and must be construed with it; that Congress intended thereby to give the District Court jurisdiction to require the Board to discharge all the usual obligations of a trustee with respect to the money and property which it holds. Compare Dollar v. Land, supra. I cannot think Congress provided no remedy against the Board when it deliberately repudiates one of the "usual obligations of a trustee" expressly imposed upon it. I would reverse and require the Board to plead.

There is no need for concern here about the Treasury being depleted if Story were allowed to recover. It does not appear that this sum of $19,000 is in the Treasury. If it is, it should not be, except as a temporary deposit, since it is not public money.