**BECK v. McGRATH, Atty. Gen.**

No. 202, Docket 21491.

United States Court of Appeals Second Circuit.

Argued May 2, 1950.

Decided May 19, 1950.

Hobart S. Bird, New York City, Lesser Brothers, New York City, for plaintiff-appellant, Rudolph J. Safarik, New York City, of counsel.

Ralph S. Spritzer, Washington, D. C., Harold I. Baynton, Acting Director, Office of Alien Property, Washington, D. C., Adrian W. Maher, United States Attorney, District of Connecticut, Hartford, Conn., James L. Morrisson, Attorney, Department of Justice, Washington, D. C., for defendant-appellee.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

PER CURIAM.

The plaintiff is in the dilemma that, if the sale of the shares was not subject to a right of repurchase by Scheerer, the parties never came to any agreement at all; in either event the "vesting" order of the Alien Property Custodian was lawful. The suggestion of a sale first came from Scheerer in a letter written to Beck on November 6, 1939, which was ambiguous, and which we may disregard. On November 30, he followed this by a radio, proposing a sale "reserving the right to buy back." This he had prefaced by two letters, dated November 29, in substantially the same terms, each confirming the radio of the next day. On December 2, 1939, Beck answered Scheerer's radio, by a radio, declaring that any sale must be "bona fide without reservation at the same time old debt must be extinguished." That obviously was not an acceptance of the offer contained in Scheerer's radio, but a counter proposal. When Scheerer got it, he at once answered by two letters of December 2, 1939, which differed in a material respect, for one of them contained the following passage: "I shall always be willing to reacquire the shares from you on a later occasion. Meanwhile I agree to effect the sale of the shares formally without reservation." Beck could never be persuaded definitively to admit the receipt of that copy; which, although in form it was only of an option to Beck to return the shares, taken with what went before, seems to mean that Scheerer was adhering to his original proposal. Whatever it meant, clearly it meant only a "formally" absolute sale, and it was not an acceptance of Beck's radio of the same day.

Moreover, assuming that Beck never did receive that copy, at best the sale had been made under a mistake as to its terms. Scheerer supposed that Beck knew any sale "without reservation" would only be "formal," while Beck thought that it was to be "bona fide." Thus, if it was a sale at all, it was subject to rescission by Scheerer. But the situation was worse even than that, because one of the terms of Beck's radio of December 2 had been that the debt was to be

"extinguished," and it was clear that that had not been done, as was evident from Beck's offer of $200. Possibly we might assume that Beck implicitly yielded that point, for he had received one copy of Scheerer's letter of December 2, when he made his offer by the radio of December 20th. But that too did not clear up the ambiguities, for the copy of the letter of December 2, which he did get, not only contained a copy of Scheerer's letter of November 29, which had in turn copied the radio of November 30, but itself contained language which was most inappropriate to a sale, "bona fide without reservations." Scheerer said in that letter that he felt bound "to repeat again that it seems indispensable * * * that the common shares so far in my possession shall be transferred to American possession because of the possibility of America * * * opening economic war against us." If American law allowed a sale at a price below par, "then I agree of course that you yourself determine the purchase price." Surely that was strange language if there was to be a genuine sale. We know that Scheerer did not intend one, and it must have been a surprise to Beck, even though he had never got the missing copy of the same date. Nor was the ambiguity cleared up when Scheerer on January 5, 1940, accepted Beck's radio of December 20th. Thus even without the absent copy of the letter of December 2, the proof of a completed bargain was missing, or, if it could be spelled out from what Beck alone knew, would have been subject to rescission by Scheerer.

The simplest explanation is that both sides did not care about what the terms were, since they wanted no more than something to show, in case the United States became involved in the war; and perhaps also in case—as some passages in Scheerer's letters make not improbable—the Reich itself sought to seize the shares. So Judge Smith found and it would be absurd to say that the finding was "clearly erroneous." Therefore, we do not find it necessary to resort to the transfer of the patent, which was patently a sham. We do not mean that that transaction does not throw light upon the transfer of the shares; it does, and, as evidence, it was competent. But it was not conclusive, and although we deem it strongly corroborative, we hold that the result would have been the same without it.

Judgment affirmed.