**FELLER v. McGRATH.**

**Civ. A. No. 7811.**

United States District Court
W. D. Pennsylvania.

June 5, 1952.

148

Daniel S. Ring (of McDaniel & Ring), Washington D. C., Harvey F. Sloan (of Griggs, Moreland, Blair & Douglass), Pittsburgh, Pa., for plaintiff.

Edward C. Boyle, U. S. Atty., and Irwin A. Swiss, Asst. U. S. Atty., Pittsburgh, Pa., Harold I. Baynton, Asst. Atty. Gen., George B. Searls, Chief Trial Atty., Washington, D. C., for defendant.

MARSH, District Judge.

This action was instituted by Karl Feller, a citizen of the United States, under Section 9(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), to recover 5,000 shares of no par common stock of Schloemann Engineering Corporation, and carried on the books of the company in his name. These shares of stock were seized and vested in the Alien Property Custodian on January 15, 1944, by Vesting Order No. 2953 as the property of a national of a designated enemy country, namely, Schloemann Aktiengesellschaft (also hereinafter referred to as SAG), a German corporation with principal offices at Dusseldorf, Germany. The Alien Property Custodian caused these stock certificates to be

cancelled and in lieu thereof caused one certificate to be issued for 5,000 shares, which is in the possession of the Attorney General as successor to the Alien Property Custodian. The assets of the corporation were sold and the proceeds thereof are also being held by the defendant.

## Pleadings

Before discussing the facts of this case, we will dispose of the question of law raised by plaintiff as to the pleadings.

Plaintiff avers that he is the absolute owner of the stock, and that the Alien Property Custodian seized the property upon the false finding that the ownership was in the German corporation known as Schloemann Aktiengesellschaft. Defendant denies these averments. On this state of the pleadings, plaintiff importunes the court to conclude that under Rule 8(c), Federal Rules of Civil Procedure, 28 U.S.C.A., it was incumbent upon defendant to plead affirmatively any matter involving fraud, illegality, or other matter constituting confession and avoidance and, since the answer is silent in this respect, defendant has waived the benefit of such defenses, i. e., to show that plaintiff entered into an agreement to conceal the beneficial ownership of the disputed stock and facts establishing a resulting trust. We do not agree. Section 9(a) of the Trading with the Enemy Act requires that a plaintiff "establish" the "interest, right, or title" he claims. This means plaintiff has the burden of establishing that he is the beneficial owner of the property involved. Beck v. Clark, D.C. Conn.1949, 88 F.Supp. 565, affirmed Beck v. McGrath, 2 Cir., 1950, 182 F.2d 315; Kaname Fujino v. Clark, 9 Cir., 1949, 172 F.2d 384; · Thorsch v. Miller, 1925, 55 App.D.C. 295, 5 F.2d 118, 122–123. Beneficial ownership is the heart of the case; it is a part of plaintiff's *prima facie* case. The denial in

the answer has put the beneficial ownership of the stock in issue, and it need not be raised by an affirmative defense. See Vol. 2 Moore's Federal Practice 1688.

## Discussion

The evidence establishes the following facts. Mr. Feller, the plaintiff, resides in the Western District of Pennsylvania. He was a German national who immigrated to the United States in 1927 and was naturalized in 1932. Prior to coming to this country, plaintiff was employed by SAG. Upon taking up residence here, he engaged in business under the name of Karl Feller, with offices in the Empire Building, Pittsburgh, Pennsylvania. Later in 1927, his connection with SAG was re-established and he managed what in substance amounted to the American branch of SAG, which branch, known as Schloemann Engineering Company, existed continuously from the summer of 1927 until August 14, 1939. (R. 72).[1]

Schloemann Aktiengesellschaft · registered under that name in Pennsylvania in 1927 as a foreign corporation. Schloemann Aktiengesellschaft under the "translation" of Schloemann Engineering Company, and in compliance with Article X of the "Business Corporation Law" of 1933, 15 Purdon's Pa. Statutes § 2852–1001 et seq., applied for and in December, 1933, received a certificate of authority from the Pennsylvania Department of State to do business as a foreign business corporation. The nature of the business was designing, engineering and selling machinery, particularly motor rollers and extrusion presses. SAG held the exclusive license to certain world wide patents used in manufacturing motor rollers.[2]

Plaintiff probably was paid a salary. There is evidence to show that beginning with the year 1937 he considered himself an employee of SAG and was to receive

1. Complete documentation is not to be inferred from references to the record and exhibits. All exhibits are defendant's exhibits unless otherwise designated.

2. Pursuant to application signed by Karl Feller, agent, on behalf of SAG, a certificate of withdrawal from doing business in Pennsylvania was issued in December,

1940 by the Department of State. Schloemann Engineering Company was then being liquidated by Mr. Feller and its business had been taken over as of August 15, 1939 by Schloemann Engineering Corporation, of which Mr. Feller was president.

a salary for that year of $12,000. Thereafter he was to receive a salary of $7,200 per year, plus a bonus of not less than $4,800 per year, which agreement could not be terminated prior to June 30, 1940.[3]

The business, assets and good will of Schloemann Engineering Company belonged to SAG.[4] (R. 82; Exhibit SSS, page 6; and see minutes of first meeting of directors, Exhibit A.) On December 27, 1938, plaintiff caused the Schloemann Engineering Corporation to be incorporated. However, it did not engage in business for some time because it had no working capital or other assets. Under date of August 9, 1939 the corporation entered into a contract of cooperation with SAG[5] and plaintiff entered into a contract with SAG,[6] in which, inter alia, he guaranteed performance by the American corporation and agreed to procure $50,000 for the American corporation as working capital. Plaintiff knew the $50,000 was to be furnished by SAG.[7] In plaintiff's contract his liability to SAG was limited to that arising from his ownership of the shares of the corporation, which fact tends to refute his contention that this money was a loan from SAG. Schloemann Engineering Corporation began to do business about August 15, 1939, upon receipt by plaintiff on the preceeding day of $50,000, which sum he turned over to it.[8] Beyond any reasonable doubt this money belonged to SAG, who caused it to be paid to the plaintiff.[9]

As security for his guaranties, and to insure control of the American corporation by SAG, the plaintiff further agreed[10] to subject the stock issued in his name to a voting trust. The draft of the voting trust agreement[11] was executed by plaintiff and by officials of the German corporation but was never put into operation. In passing, we observe that if Mr. Feller had refused to put the voting trust into operation over SAG's objection a court of equity would likely have enforced this voting trust agreement upon application. "Equity regards that as done which ought to be done."

Throughout the period 1927–1939 a confidential relationship existed between plaintiff and the directors of SAG.[12] Early in this relationship the parties recognized that certain advantages would accrue if the American branch were incorporated. In general these were: (1) to offer assurance to American customers that they were doing business with a responsible American corporation; (2) to facilitate importation of German machinery through customs at minimum tariffs; (3) to place American banking affairs on a sound basis.[13]

Probably in the summer of 1937, an agreement to incorporate and conceal the ownership of the American branch was consummated between plaintiff and certain officers of SAG. This agreement in substance provided that SAG was to furnish the capital in the sum of $50,000.00; the concealment was to be accomplished by

---

3. Exhibits J, K, EEEE, 206(c).

4. Plaintiff strenuously disputes this finding and contends that a contrary finding is required from the uncontradicted testimony of Mr. Feller, who was called by defendant as an adverse witness under Rule 43(b), Fed.Rules Civ.Proc., and in support cited, inter alia, Moran v. Pittsburgh-Des Moines Steel Co., D.C., 86 F. Supp. 255. We think plaintiff's testimony in this respect was contradicted by the correspondence and circumstantial evidence, but even if it were not, the defendant is not bound; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1950, 183 F.2d 467, 471, reversing the district court.

5. Exhibit HH, later amended by Exhibit KK.

6. Exhibit AA.

7. See R. 116–119; Exhibits M, BB, CC; Exhibit B; R. 86–89.

8. See Plaintiff's Exhibit 3.

9. Plaintiff's Exhibit 17.

10. See footnote 6 supra.

11. Exhibit II.

12. Exhibit 206 (page 2"e").

13. The German connections of Schloemann Engineering Company were such that increased tariffs upon German machinery were foreseeable. The parties considered that these could be avoided if the German ownership of an American corporation were concealed. See defendant's Exhibits SS, BB, SSS (page 4) and UUU.

placing the shares in the name of the plaintiff; control and beneficial ownership in SAG were to be firmly secured.[14] There is no direct evidence that this agreement to conceal was entered into at a specific time and place, or that it was written or verbal; but the existence of such an agreement is to be inferred from the testimony of plaintiff, from his negotiations with the officials of SAG, from the contracts between the parties, the actions and reactions of the plaintiff and the Germans from 1927 through 1939, and from the circumstances.[15]

An agreement to conceal ownership is not necessarily a conspiracy in the criminal sense, but it closely resembles a conspiracy in that the underlying characteristic is secrecy, and like a conspiracy the proof of its existence is ordinarily to be found from the circumstances.

It was adequately shown that nothing could have been done concerning German assets abroad without a license from the branch of the German government called the "Devisenstelle," which was Hitler's agency in control of foreign exchange. This fact implicates the German government as a necessary party, by way of ratification, to the agreement to conceal, which later, in 1939, as between SAG and the German government, took the form of a conspiracy to cloak SAG's ownership of the American corporation.

Possibly in the fall of 1938 and certainly in the spring of 1939, the plaintiff and his German associates foresaw the approach of war between Germany and the United States.[16] International relations had been steadily deteriorating. In the United States a boycott of German companies and goods was in progress; restrictions upon or seizures of German property were foreseeable in the event of war; the Devisenstelle and SAG recognized that these hazards could be avoided if the incorporated American branch could be effectively cloaked. Plaintiff testified that he refused to participate in any cloaking arrangement and vigorously protested against such a project.[17] It is to be noticed that some of his protests seem to be directed more to the means suggested for cloaking rather than to the cloaking itself;[18] but in spite of these protests negotiations continued (Exhibit CC). A few months later plaintiff received the $50,-000.00 from his German employer which he exchanged for the shares of the American corporation, issued in his own name. This was in substantial accord with the 1937 agreement and the continuous planning over the years. Thus, the court finds that plaintiff did not abandon or withdraw from the agreement to conceal SAG's ownership even in the face of war, but instead, consummated it.

Plaintiff asserts he not only abandoned the plans to conceal SAG's ownership but, on August 15, 1939, *he became the absolute owner of the American corporation.* He urges that in the spring of 1939 he intended to secure for himself the beneficial ownership of the American branch to the exclusion of his German employer. There is very little convincing evidence on plaintiff's part of any intention to transfer the ownership of the American assets to himself. It does not appear that he ever notified SAG of this new "self-allegiance," or for that matter that he was severing the relationship of principal and agent, which position of trust had existed for twelve years between him and SAG. An agent or employee in a position of trust has a heavy burden to establish ownership of the property of his principal. As stated in Bergner v. Bergner, 1907, 219 Pa. 113, 67 A. 999, 1001:

14. Exhibits SS, TT, G, F (pages 4–5); R. 134–141.

15. Some of these circumstances are set out hereinafter under the heading "Resulting Trust."

16. R. 545; Exhibits XXX; SSS (page 5); EEEE (page 2).

17. Exhibit X; Exhibit BB.

18. For example, he objected to the proposed unconditional "loan with option" contract (Exhibit P–1) with Kleinwort Sons & Co., SAG's English bank, because, as he stated, it would not stand up under American investigation. If this option contract had been executed, inspection of it would have certainly branded plaintiff as a pawn of SAG.

"The principles applicable to cases of this kind are familiar and not difficult of application. A not unimportant one in this connection is that where the agency has been once entered upon, except the contrary be shown, the law will presume that whatever was done in furtherance of the original scheme which the agency was created to effect was done under and through the agency. The burden of showing that the relation was changed before or during the transaction rests upon the party so affirming. Another, no less important, is that an agent to purchase cannot be allowed, except as his principal assents, to purchase for himself. He can acquire nothing by an adverse purchase, even though he contribute of his own means or credit to effect it; the product will belong to the principal exclusively. It is unnecessary to cite authorities in support of either of these propositions. They result necessarily from the fact that agency is a recognized fiduciary relation; its vital principle is good faith, without which the relation could not exist. * * *

"The [agent's] right to terminate his agency at any time is conceded. If he exercised it when he says he did, in advance of the second purchase, in a way the law will adjudge sufficient, then his contention as to his ownership of a proportionate part of the stock must be sustained; otherwise not. The qualification, as we have stated it, is a necessary one; the privilege must be exercised in a way the law will adjudge sufficient. No fixed form or method is prescribed; but, to be effective to relieve the agent from the duties and obligations he has assumed, the renunciation must not only be *positive* and *unequivocal*, but *it is essential that it be made known to the principal.* An undisclosed purpose to renounce is without effect. As the intelligent assent of the parties is necessary to establish the relation, so its dissolution must rest upon the knowledge of both. * * *

'An agent to purchase will not be allowed to purchase for himself and hold the property in his own name, unless he has openly and notoriously discharged himself from his agency.' However much this statement of the rule may be qualified by varying circumstances, certain it is that a renunciation under any conditions, to enable an agent to do what is here expressed, must be communicated to the principal in such a way as to bring home to him notice of the agent's determination. [Emphasis added.]"

Thus, if credence is given to plaintiff's testimony that he intended to acquire the new corporation for himself, as the record stands, his actions in carrying out that intention constituted a breach of confidence reposed in him by his employer who, if it had not become an enemy, would have had grounds to recover the stock on the principles of law quoted above. Also, if true, there was no meeting of the minds and SAG, as a party to the supposed agreement, would have been entitled to a return of its property; Kind v. Clark, 2 Cir., 1947, 161 F.2d 36, 46–47; and the stock was properly vested in the Alien Property Custodian; Beck v. McGrath, supra.

However, the court does not believe that plaintiff overreached SAG. Instead, we find that the agreement to incorporate and conceal was consummated in August, 1939, when he accepted SAG's $50,000.00 and purchased the stock of Schloemann Engineering Corporation with it.

Regardless of Mr. Feller's mental reservations at that time, it is certain that the Germans in the face of possible war did not abandon the cloaking project, but rather intensified their efforts to perfect it. The Devisenstelle ordered: "A written agreement between the business manager of the American Company, Herr Feller, and you [SAG], will not be made. You will rely on Herr Feller's oral promise that he will give you the shares in settlement of his loan debt." [19] This arrangement was on condition that the stock should be subject to the voting trust agreement between SAG

19. Exhibits 212, 209.

and plaintiff. The security afforded by this voting trust agreement was later given up, apparently in order to more effectively conceal SAG's ownership, and to make Feller's ownership appear real.

It is likewise certain that the intentions of SAG to retain the ownership of its American branch were never relinquished. They expected Mr. Feller to retain the shares as a cloak until the crisis was past,[20] at which time he was to return them.

Also pertinent here to note is the expressed belief of a director of SAG about this time that plaintiff was "frightened" by the approach of war, but neither SAG nor the Devisenstelle were advised by plaintiff specifically *that he refused* to hold the stock of the American corporation in his name for the benefit of SAG. Certainly, some such definitive statement from him was called for after all the writing and planning to the contrary.

It was established by plaintiff that after August 15, 1939, SAG did not receive profits or exercise control over Schloemann Engineering Corporation. This evidence cannot be accorded much weight, however, because it is consistent with a carefully planned agreement to conceal. The obvious strategy then was to refrain from all compromising correspondence, indications of control and accountings until it was safe to do so.

Other circumstances tend to point up SAG's beneficial ownership; there are the provisions in plaintiff's contract with SAG[21] in which, as sole stockholder, (1) he agreed to split his voting power with SAG, and (2) limited his right to issue the unissued shares without the consent of the second voting trustee, who was to be named by SAG.

On September 8, 1939, he forwarded the names and nationality of the personnel[22] of the American corporation to SAG, which is suggestive of a continuing allegiance after the corporation started to do business on SAG's money.

He had been appointed assistant secretary of SAG in June, 1939, with authority to sign documents in its behalf;[23] this authority he actually exercised *after the American corporation started to do business* in August, when on behalf of SAG he amended its contract with Schloemann Engineering Corporation.[24]

Plaintiff notified SAG in June, 1939, that he had placed a signed but undated letter of resignation as director of Schloemann Engineering Corporation in the files of that company.[25]

Then there is the unexplained circumstance that in June, 1939, plaintiff sent 5,000 shares of unissued stock to SAG, apparently as further "security."[26] Unnaturally, he never requested the return of same even though he now claims to have been the absolute owner of all the issued stock since August, 1939. His silence in this respect forms another link in the odd chain of circumstances and suggests that plaintiff was satisfied that SAG should retain a token of his fidelity.

These considerations in the light of the whole record corroborate our conclusion that an agreement to conceal SAG's ownership of its American branch was executed. In reaching this conclusion it is unnecessary to find that plaintiff consciously joined in the obnoxious 1939 conspiracy between SAG and the Devisenstelle to cloak German ownership so as to prevent seizure in case of war; it is sufficient to find as we do, that he intended to and did carry out the innocuous agreement of 1937 to conceal German ownership for business reasons. On no other theory can his acts and the acts and declarations of the interested parties in Germany be reconciled. Stoehr v. Wallace, 1921, 255 U.S. 239, 251, 41 S.Ct. 293, 65 L.Ed. 604. See also Kind v. Clark, supra.

20. Exhibit 207.

21. Exhibit AA.

22. See Exhibit NN. The Devisenstelle had previously demanded this data on personnel. See Exhibit 205(1), (e); Exhibit 206, pages 2, 3.

23. Exhibit R.

24. See Exhibit KK amending Exhibit HH, and R. 276.

25. Exhibit BB, page 4.

26. Exhibit BB, page 3.

## Evidence

Plaintiff strenuously argues that the statements and interoffice communications of his German employer and the correspondence of branches of the German government which dealt with the establishment of the American corporation are not admissible in evidence and should be stricken from the record. Some of the foregoing facts are found and others materially corroborated by this documentary evidence. Plaintiff contends earnestly that these negotiations and statements are not relevant unless and until it is shown that a conspiracy to violate the Trading with the Enemy Act was entered into by the parties, including the plaintiff. We think this proposition predicates admissibility too narrowly.

■■ From a review of the admissions, statements and correspondence of the plaintiff, and his actions and the other circumstances, we have found that plaintiff was a party, along with SAG and the Devisenstelle, to an agreement made in 1937 to conceal SAG's ownership of a proposed American corporation for business reasons. Therefore, the declarations of the German parties to this agreement are admissible in evidence against the plaintiff. The agreement need not amount to a conspiracy. Hitchman Coal & Coke Co. v. Mitchell, 1917, 245 U.S. 229, 38 S.Ct 65, 62 L.Ed. 260. An agreement once proved is presumed to continue until the contrary is established, and we have found plaintiff did not abandon the agreement to conceal. See United States v. Perlstein, 3 Cir., 1942, 126 F.2d 789, 798. For these reasons plaintiff's Motion to Strike the written declarations of the German parties to the agreement and certain admissions of the plaintiff as specified therein is denied.[27]

The objections by plaintiff to Dr. Hentschel's memoranda of telephone conversations (Exhibits FF and DDD) with plaintiff should have been sustained and have not been considered; neither have we considered the contents of Exhibit 22 and plaintiff's Exhibit 10, and believe the objections to these exhibits should have been sustained.

## Resulting Trust

■ Even if we should agree with plaintiff that the agreement to conceal was not established, the facts and circumstances still show that SAG was the beneficial owner of the stock upon a resulting trust and that plaintiff held the legal title to same as a resulting trustee. These facts are:

1. Plaintiff admits that the negotiations contemplated that SAG send $50,000.00 to him to be paid to the American corporation. In August of 1939, plaintiff received this amount through Goldman-Sachs (see Exhibits B and C), a New York banking house and known to plaintiff as the correspondent of Kleinwort Sons & Co. He knew that in the prior negotiations SAG considered Kleinwort Sons & Co. as the intermediary for an unlimited "loan with option" of $50,000.00. Although plaintiff testified[28] *that he did not know* that the $50,-000.00 came from SAG, this is simply incredible;[29] as also is his statement made to investigators (R. 686) that if the money came from SAG he did not know whether it was sent to him as a loan or as compensation for services he rendered in a deal between Mesta Machine Company and SAG.[30, 31]

If plaintiff actually did not know why the $50,000 was sent to him it is a singular circumstance that for a period of two and one half years immediately following its receipt he did not inquire concerning its purpose

27. The Motion to Strike is written and is also found in the record at pages 750–754.

28. R. 700–701.

29. See R. 118–119; R. 171, 174; Exhibit M, Exhibit 17.

30. The Mesta deal was initiated in 1938 when plaintiff was definitely on salary. Adequate proof was not offered that SAG intended the $50,000.00 to be extra compensation for the services of a highly paid executive; the presumption would be against it in absence of such proof. See 56 C.J.S., Master and Servant, § 129 (a).

31. The American corporation had advanced $50,000.00 to Mesta Machine Company in part payment of an obligation of SAG. Plaintiff knew this fact and expected that the Pittsburgh branch would be reimbursed by SAG through Kleinwort Sons & Co.

from either Kleinwort Sons & Co., whom he knew were SAG's English bankers, or from the officials of SAG. As he states in his Supplemental Memorandum, from August, 1939 until December, 1941 "diplomatic relations and communication facilities were maintained" between Germany and the United States. He testified that he had many conversations with SAG after the corporation was formed. (R. 88.) During that period he displayed no curiosity whatsoever about why the money was sent.[32] He did not inquire of Kleinwort Sons & Co. until 1945, after the end of the war, although communication with England was possible.

It is significant also that parties who have been engaged in voluminous correspondence and meticulous planning suddenly become economy minded paperwise and did not correspond about the actual transmittal or receipt of this considerable amount of money. All we find in the testimony in this respect is some vague conversation over the transatlantic telephone. (R. 116 et seq.)

2. Plaintiff admits he deposited the $50,000 in the bank account of the American corporation, after which he secured possession of the disputed stock which he had previously deposited with Goldman-Sachs in May, 1939, pending the execution of the voting trust agreement or other instructions from SAG. (Exhibit BB, pages 3-4.)

3. Plaintiff's present contention that the $50,000 must have been a loan is untenable. No note or written acknowledgment was given; no interest paid; and no terms of repayment agreed upon. Only upon the books of SAG and in the post-war statements of its officials is there evidence that this money was a personal loan or a "trust loan" to plaintiff. In view of the conspiracy between the Devisenstelle and SAG to cloak the German ownership of this American corporation, these declarations carry no weight.

In the 1939 negotiations the "loan" was to be secured by an unlimited option which in effect was ownership of the stock. Mr. Feller and later the Germans realized that a loan subject to this option or to a voting trust, was obviously counterfeit, and these conditions were ultimately discarded, but the duplicitous characteristic of the appellation is not so easily shed. It still remained a counterfeit loan.

Plaintiff argues that the "loan" was negotiated at arm's length; but the force of this contention abates with the provision in his contract of guaranty[33] limiting his liability to the value of the shares.

4. There was some suggestion (R. 686 and 523 et seq.) that the money sent by SAG was appropriated by plaintiff as compensation for services rendered in the Mesta deal. (See footnote 30). SAG in sending the money to plaintiff plainly intended to rely upon plaintiff's "oral promise, to deliver the shares to us when required in settlement of his debt"[34] in order that "Feller could state at any time, that the company was his property."[35] In this regard, SAG acted upon the order of the Devisenstelle.[36] It may be inferred that SAG communicated this order to Feller by telephone about August 9, 1939, when the money was released. If so, he had no right to appropriate it otherwise. He admits that there was no agreement reached with SAG for such compensation. (R. 417).[37]

Even if plaintiff's contention that he applied the money to his compensation for the Mesta deal is accepted, it is again most peculiar that for two and one half years he did not so inform SAG of that fact. A confidential agent, such as Feller appeared to have been as manager of SAG's American branch for twelve years—under a tenuous legal setup for most of it, would hardly pull down the curtain of silence in such abrupt fashion upon such an important item. Meticulous correspondence dealing with less

---

32. The evidence shows that plaintiff and SAG corresponded at least until October, 1940.

33. Exhibit AA.

34. Exhibit 207.

35. Ibid.

36. Exhibits 209 and 212.

37. Misappropriation of money sent for a specific purpose would render the receiver liable as a constructive trustee for the money or its increment—the stock— see 54 Am.Jur., Trusts, §§ 218, 230, 231, 248.

important details had theretofore been the rule.

But plaintiff did not report the $50,000 as income in his 1939 income tax return. In 1942, after investigation, he stated to the revenue investigators (R. 686) that *if the money came from SAG* he appropriated it as compensation. He was then assessed and in 1945 paid income tax upon this money. (R. 689-691.) [38]

5. On August 15, 1939, it seems that SAG's $50,000 constituted the only tangible asset and was in fact the purchase price for the 5,000 shares. Evidently the liabilities assumed by the new corporation exceeded the cash on hand and accounts receivable of the old Schloemann Company.[39] SAG also contributed additional value to its American corporation such as good will and the accumulated patterns, designs and patents which were transferred. Apparently no assets or consideration passed from plaintiff to SAG. As stated, SAG intended to retain the beneficial ownership of the stock of its erstwhile American branch and this intention is implicit in thus giving financial life to the new corporation.[40]

As set forth in the Restatement of the Law of Trusts, § 440: "Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid * * *." And in comment "h" of the same section, the statement is made that a resulting trust arises where the purchase price is paid to the vendor by the transferee with money or other property belonging to another person with the consent of the other person.

As to the burden of proof the Restatement at § 458, comment "a", states that the "ultimate burden of proof is on the payor to establish the fact that the money was his money and was paid as his money; but if he shows that it was his money, the burden of going forward with evidence that it was

paid by way of loan to the transferee is on the transferee."

In the instant case the defendant, as successor to the interest of SAG, has by clear, precise and satisfactory evidence established the fact that the money and property paid to the American corporation by Mr. Feller in consideration for the stock belonged to SAG, and that it was paid to the American corporation with SAG's consent and at its direction. The burden of going forward with evidence to establish that the $50,000.00 was a loan or compensation rested upon plaintiff, and he has failed to sustain this burden. Therefore, a resulting trust in the shares was established in favor of SAG.

In this connection it is the court's opinion that the statements, declarations, memoranda and inter-office communications of the officers of SAG are admissible as evidence of the intention of the directors of SAG in 1939 to retain ownership of the American corporation and to rebut any suggestion that the money sent was a loan or compensation.

As a witness Mr. Feller's sincerity was impressive and made our solution of the case most difficult. He rendered important wartime services to the United States. Under his direction Schloemann Engineering Corporation prospered greatly, especially during the war. The Government delayed seizure of the stock until 1944 after the vital extrusion presses had been designed and built. Notwithstanding, in our opinion he failed to overcome the fact that the life blood of Schloemann Engineering Corporation was furnished to him by SAG in the form of $50,000 so that he could purchase the disputed shares which were issued in his name and delivered to him; and he failed to establish that this money was furnished by SAG as a loan or as compensation. On the other hand, it is clearly and satisfactorily shown that it was furnished by SAG in order to activate its American branch as a corporation. Mr. Feller's per-

38. Exhibits 23 and 24. Plaintiff paid $16,930.52 to the Collector of Internal Revenue on May 28, 1945. This payment was made under protest in view of the inconsistency between the tax as-

sessment and the action theretofore taken by the Alien Property Custodian.

39. Exhibit DDDD: R. 577.

40. A gift of the money is negatived by plaintiff on the record. (R. 523.)

suasive sincerity relating to his ownership of the stock can only be reconciled upon a basis that he does not recognize the doctrine of resulting trusts.

The burden of proof is on plaintiff to establish his claim: Thorsch v. Miller, supra. He must satisfy the court by a preponderance of evidence that he holds the full beneficial ownership. Here plaintiff proved prima facie that he had legal title to the stock in question. The defendant then went forward with the evidence and shattered the weight of plaintiff's evidence—indeed, defendant proved by clear and satisfactory evidence that the German corporation was the beneficial owner of the stock. Consequently, we find plaintiff did not sustain his burden of proof, and plaintiff's record ownership of the stock is a simulacrum. See Stoehr v. Wallace, supra.

Appropriate findings of fact, conclusions of law and a decree will be filed herewith.