291 F.2d 460
 MANUFACTURERS TRUST COMPANY, individually and as Trustee for
American Creditor Banks under German-American Standstill
Agreements; French American Banking Corporation; Guaranty
Trust Company; City Bank Farmers Trust Company and Bankers
Trust Company, Plaintiffs-Appellants,
v.
Robert F. KENNEDY, Attorney General of the United States,
Defendant-Appellee.
 No. 380, Docket 26833.
 United States Court of Appeals Second Circuit.
 Argued May 8, 1961.
Decided June 14, 1961.
 
 1
 Orison S. Marden, New York City (White & Case, New York City, and A. Hayne deYampert, New York City, on brief), for appellants.
 
 
 2
 Lola S. Lea, Asst. U.S. Atty., New York City (Robert M. Morgenthau, U.S. Atty., and Stephen Kurzman, Asst. U.S. Atty., New York City, on brief), for appellee.
 
 
 3
 Before FRIENDLY and SMITH, Circuit Judges, and WATKINS, District judge.*
 
 
 4
 WATKINS, District Judge.
 
 
 5
 This is an appeal by plaintiffs-appellants from a final judgment on the merits, as well as from the action of the District Court in granting defendant's motion for summary judgment as to plaintiff, Manufacturers Trust Company, as trustee. The action was brought by plaintiffs under section 9(a) of the Trading with the Enemy Act,[1] seeking the recovery of a fund amounting to $328,653.20, which was vested (i.e. seized) by the Attorney General[2] on November 25, 1947, as property of an enemy, the German Reichsbank (Vesting Order 10261.)
 
 
 6
 The complaint contains three causes of action. The first two consist of claims to the fund by Manufacturers Trust Company as an alleged trustee for certain 'American Creditor Banks,' and the third cause of action is for return of the vested funds to the Trust Company as depository, or, in the alternative, for return on a pro rata basis to the five individual plaintiffs (creditor banks) the respective parts of the $328,653.20 claimed on their behalf by he Trust Company.
 
 
 7
 Plaintiffs claim that the Trust Company was named trustee of these funds for the benefit of American creditor banks pursuant to regulations issued by the German Reichsbank under authority granted in an international credit agreement, known as the German-American Standstill Agreement of 1941. They further claim that since neither the Trust Company, nor the American creditor banks are enemies as defined in the Act, the Trust Company is entitled to a return of the funds under section 9(a) of the Act, in order that it might distribute the funds to be beneficiary banks. Five banks are named plaintiffs in their individual capacities as beneficiaries of the alleged trust, and say that their portion of the funds amounts to $172,884.25. The other 16 alleged beneficiary creditor banks are not named as individual plaintiffs. The answer of the Attorney General does not deny the non-enemy status of the plaintiffs, but does deny that any of the plaintiffs ever acquired any interest in the seized property in any capacity.
 
 
 8
 Both sides moved for summary judgment, and submitted affidavits, exhibits and oral argument in support of their respective motions. The trial judge denied plaintiff's motion, granted the motion of defendant as to the first and second causes of action in which the Trust Company sued as trustee, and denied defendant's motion as to the third cause of action in which the individual banks were named as plaintiffs. See Manufacturers Trust Co. v. Rogers, D.C.S.D.N.Y. 1960, 181 F.Supp. 116. The only issue left remaining for trial was the ownership interests, if any, of the five individual plaintiff banks in the seized funds under the third count of the complaint.
 
 
 9
 The trial court pointed out in his opinion that the papers filed in support of the motions for summary judgment were primarily directed to rights under the 1941 agreement and to legal principles, and that more evidence was desired as to the alleged individual interests of the five creditor banks. No further evidence was offered by either side when this issue was tried on the merits before the court without a jury, and the court was asked to determine the ownership of the vested funds on the basis of the same exhibits which were before the court on the summary judgment motions. On January 30, 1961, final judgment in favor of the defendant was entered. It is from this judgment, as well as from the decision upon the cross-motions for summary judgment that this appeal is taken by plaintiffs.
 
 
 10
 The issue on appeal has been limited by agreement of the parties. Section 9(a) of the Act requires one claiming property vested by the Alien Property Custodian, to show, first, that he is 'not an enemy or an ally of enemy,' and second, that he has an 'interest, right or title' in the vested property in order to secure its return. As to the first requirement, it is agreed by the defendant that plaintiffs satisfy the statute. Concerning the second requirement, the trial court found, on motions to dismiss with regard to the claims of the Trust Company as trustee, and, after a trial on the merits with regard to the claim of the five individual plaintiffs, that none of the plaintiffs proved the requisite interest in the property to allow recovery. We feel that the issue was decided correctly, both as to the Trust Company as trustee and the individual plaintiffs, and affirm.
 
 I. General Background
 
 11
 In the autumn of 1930, when a general election was held in Germany, only 12 members in the previous Reichstag were returned to office, whereas 107 members of the National Socialist (Nazi) Party were elected. Subsequent to this election, German foreign creditors began to withdraw credits previously extended to German nationals. These withdrawals became so greatly accelerated that it was evident that Germany was in serious trouble with respect to its foreign exchange reserves. To meet this danger the German Government instituted a system of foreign exchange controls which were administered by the German Reichsbank and the German Golddiskontbank. An International Conference was held in London in 1930, and another in Basel, Switzerland, in 1931, attended by representatives of the two German banks, German debtors and their foreign creditors, to work out an arrangement looking toward the maintenance of the volume of credit already extended to Germany in order to prevent the complete collapse of her foreign exchange position and her foreign trade. This latter meeting resulted in the German Credit Agreement of 1931, the signatories thereto including representatives of European and American creditors, who agreed to a six months' extension of German short-term indebtedness in the amounts and on the terms then existing, in return for which interest payments on the indebtedness and payments to cover maturing debts were exempted from Germany's foreign exchange controls. These exemptions from the foreign exchange moratorium were in recognition of the intended preferential position of these foreign banking credits as compared to obligations of a different nature. Upon the expiration of the 1931 agreement, similar one-year agreements were entered into each year up to and including 1939.
 
 
 12
 War broke out in Europe in September, 1939, and the 1939 agreement was promptly abrogated. Thereupon, a new agreement was negotiated by a committee representing American creditor banks, a committee representing German debtors, and the German Reichsbank and the Golddiskontbank, relating only to short term credit lines extended by American creditor banks. This agreement, called the 1939 German-American Standstill Agreement, expired on May 31, 1940, and was succeeded by the 1940 German-American Standstill Agreement which extended the arrangement for six months from June 1, 1940, and was then extended until May 31, 1941.
 
 
 13
 In consideration for maintaining these short term credit lines with their German debtors, the foreign creditor banks acquired, under Clause 10(1) of the 1933-1940 Agreements, the right to call upon their respective debtors to repay their indebtedness in German currency, i.e. reichsmarks, which were deposited in accounts in the Reichsbank, which maintained a register showing the amount of reichsmarks held for the account of the particular foreign bank. These payments so deposited were called 'registered credit balances,' and the foreign creditor banks for whom such registered creditor balances were maintained were called 'registered holders.'
 
 
 14
 The 1936 Agreement and subsequent agreements (Clause 10(7)(a)) gave creditor banks the right to transfer their registered credit balances into travel mark accounts, which travel mark accounts could be used, under terms of the agreement and regulations established by the Reichsbank, by persons residing outside Germany, to pay for travel expenses while in Germany. Another provision gave the Reichsbank the right to modify or cancel all provisions relating to the holding of travel mark accounts and the right to withdraw from any particular creditor the privilege of holding such travel mark accounts in case of abuse (Clause 10(7)(a)).[3]
 
 
 15
 The 1940 Standstill Agreement gave the American creditor banks the right to sell reichsmarks from their registered credit balances for benevolent remittances to German nationals by persons outside Germany (Clause 4(7)(c)). All this was of great benefit to the foreign creditor banks because it enabled them to sell travel marks, make benevolent remittances, collect in dollars, and thereby secure debt repayments previously made in reichsmarks. It permitted American creditors to convert reichsmark registered credit balances into dollars, subject, of course, to the overriding control of the Reichsbank.
 
 II. Creation of License Fees
 
 16
 Before 1937, the German Reichsbank, under its regulations, assessed and collected a fee in reichsmarks on all drafts drawn against travel mark accounts when such drafts were presented for payment in Germany. This was done independent of the terms and provisions of the various agreements. In 1937 these Reichsbank regulations were cancelled, and new regulations, independent of any requirement imposed by the agreements, became effective, whereby the Reichsbank levied a license fee upon the transfer of funds from a registered mark account to a travel mark account.[4] A similar regulation required a license fee for transfer of registered balances for benevolent remittances. When an American creditor transferred a part of his registered balance into a travel mark account, he was required to pay into a special account in the Manufacturers Trust Company a certain amount of American dollars per 100 marks. Those fees were $4.50 per 100 marks for travel transactions and $3.35 per 100 marks for benevolent remittance transactions during the period here involved. These license fees, collected after May 31, 1941, constituted the corpus of the two accounts, vested by the Attorney General in 1947, which the plaintiffs seek to recover in this action.
 
 
 17
 The Reichsbank regulations also required the registered holder to collect the fee from any subsequent holder of the travel mark account, and the latter, in turn, was required to collect the fee from the ultimate user of the travel marks. Such regulations also provided: (1) the license fee had to be passed on to and paid by the ultimate purchaser of the travel marks as part of the 'global' price at which such marks were sold; (2) the license fees had to be remitted to the 'Reichsbank Standstill Account' of the depository agency (Manufacturers Trust Company in the United States); and (3) the regulations were to remain in effect unless cancelled or amended by the Reichsbank. The holder of the travel mark account, or his agents, in some situations could forward the license fee collected directly to the Trust Company instead of forwarding it to the registered holder. Similar procedure related to marks used for benevolent remittances. The Reichsbank always gave the Trust Company explicit instructions as to the opening of Reichsbank Standstill Accounts.
 
 III. Disposition of License Fees
 
 18
 Each of the 1937-1940 Standstill Agreements contained Clause 4(10), which set forth the manner of disposition of these license fees. All license fees levied by the Reichsbank were to be held for the Reichsbank in a separate special account to be administered at the discretion of the Reichsbank under Clause 4(10), wherein the Reichsbank promised to make these license fee accounts available to creditors as an additional potential source of foreign exchange in their own currency. The Reichsbank agreed to turn over its license fees only upon the occurrence of both of the following events:
 
 
 19
 First, on three different dates during the year, called apportionment dates, the Reichsbank was to make an apportionment of the license fees among the creditors who were adherents to the current Standstill Agreement. No apportionment was made by the Reichsbank of the license fees in question, because there were no adherents and, in fact, no existing Standstill Agreement to which the creditor banks could adhere. The amount which a creditor was to receive was to be computed by the Reichsbank on the basis of the percentage which that creditor's outstanding credits bore to the total amount of credits extended by all the creditor banks on the date of apportionment. If a particular American creditor bank had extended 25% Of the total credits extended by all American banks as of a given date, the Reichsbank would apportion 25% Of the accumulated license fees in the special account in the Trust Company.
 
 
 20
 Second, the money so apportioned could be released to the creditor only if and when the creditor's German debtor actually purchased from the Reichsbank with reichsmarks an amount of foreign exchange (dollars) equivalent to the amount made available to such creditor by the Reichsbank apportionment. The German debtor was to make this purchase or payment when called upon by his foreign creditor in reduction of his indebtedness. The license fee fund was not a bonus to the American creditor bank, but was to be utilized as another means of effecting repayment to the American creditor in dollars rather than reichsmarks. When the German debtor made such purchase or payment, the Reichsbank would then release the fees, held for it by the Trust Company, to the American creditor bank, and that bank would then credit its German debtor accordingly. For example, if a New York bank was an adherent to the Standstill Agreement of 1940, it had a registered credit balance with the Reichsbank. It could transfer a part of this credit balance to a travel mark account, upon which transfer the Reichsbank levied a fee. The bank could then sell travel marks against its travel mark account, collecting from the ultimate user of the travel marks both the cost of the reichsmarks and the transfer fee in American dollars. The bank would keep the dollars from the sale of the reichsmarks and its credit balance in the Reichsbank was reduced accordingly. It paid the amount of the license fee, levied by the Reichsbank, in dollars to Manufacturers under the Standstill Agreement. If and when the Reichsbank made its apportionment, the bank received its proportionate share. If its share was $10,000.00, it would notify its debtor in Germany, and that debtor would then pay the equivalent in reichsmarks to the Reichsbank. Upon receipt of this money from the German debtor, the Reichsbank would then notify Manufacturers to release or pay out of the Reichsbank Standstill Account the sum of $10,000.00 to the New York creditor bank. Upon receipt of same, the bank would credit the account of its German debtor. Thus, the Reichsbank would collect its license fees, and the New York bank would collect its payment from its German debtor in dollars instead of reichsmarks.
 
 
 21
 The Reichsbank kept the reichsmarks to apply 'toward expenses of administration of the travel marks' and 'as a further contribution to the expenses of the Standstill administration,' as provided in the 1940 Standstill Agreement. The reichsmark equivalent of the seized fees or funds was less than the amount of costs (4,000,000 marks) due the Reichsbank for its administration of the travel marks already sold. Had there been an existing contract and adherents thereto, and the necessary apportionment after May 31, 1941, as to the funds in question, the reichsmark equivalent of the seized funds would have been paid to and kept by the Reichsbank as its property to apply to the costs already incurred in connection with the administration of the travel mark accounts under the Standstill Agreement.
 
 
 22
 Each of the Standstill Agreements was negotiated and signed by the German Reichsbank, the German Golddiskontbank, and committees representing foreign creditors. However, the committee representing the American creditors was not a legal entity and no indebtedness was owed to it. Its sole function was to negotiate the agreements and to advise and recommend to constituent banks the actions such banks should take. It did not attempt to bind the individual American creditor banks and had no authority to do so.
 
 IV. Adherence
 
 23
 The Standstill Agreements provided a procedure, called 'adherence,' by which individual foreign creditor banks and their respective debtors could become parties thereto, become bound thereby, and become entitled to the benefits thereunder. The procedure demanded that the individual creditors, within a stated period of time, notify their respective German debtors on a standard form letter of their willingness to adhere to the agreement, setting forth the short-term credit lines with respect to which adherence was being effected. In turn, the German debtors then sent to their respective creditors a letter on a standard form confirming their adherence. It was not until such adherence was so effected that the foreign bank creditors and their German debtors 'became parties to (the) Agreement in respect to short-term credit lines so specified and * * * entitled to the rights granted to and * * * subject to the obligations under (the) Agreement.'
 
 
 24
 If American creditor banks, which were adherents to the Agreement, had ceased to be creditor banks because of payments by their debtors between the time of adherence and the apportionment date, they could, nevertheless, obtain their share of the license fees by transferring their rights thereto to another adhering creditor, or by paying to the Reichsbank the reichsmarks equivalent out of their accumulated registered credit balances.
 
 
 25
 The German - American Standstill Agreement of 1940 was to expire on May 31, 1941, and on that date no new agreement had been reached by the American and German Committees. The two Committees were about to agree on a proposed draft when, on June 14, 1941, financial transactions with Germany and its nationals were blocked by Executive Order 8389. The last member of the American Committee signed the Agreement on June 30, 1941. An application by the American Committee to obtain a Treasury License to use blocked German funds to service the Standstill debt was denied on August 11, 1941. It is conceded by the plaintiffs that no American creditor ever adhered to the 1941 Agreement.
 
 
 26
 After the 1940 Standstill Agreement expired on May 31, 1941, the transferors of marks for travel and benevolent purposes continued to collect and remit license fees to the Trust Company. These collections came about because the American banks possessed registered credit balances and travel mark accounts after expiration of the 1940 Agreement. The license fee collections paid into the Trust Company after May 31, 1941 (the date the last Agreement which had been adhered to by any American creditor expired) amounted to the sum of $328,653.20, and constitute the specific property involved in this action. Millions of dollars in license fees were distributed to to creditor banks under the 1940 and prior agreements.
 
 
 27
 On May 21, 1941, and again on November 26, 1941, the Reichsbank instructed the Trust Company to credit these license fee payments to its Standstill Accounts 1941. The Trust Company opened the Reichsbank accounts (I and II), but entitled them 'Special Account Manufacturers Trust Company as Trustee for American Creditor Banks under German-American Standstill Agreement of 1941' (I and II). There is conflict in the affidavits as to whether the Reichsbank consented to the labelling put on the accounts by the Trust Company.[5] But we are of the opinion, for the reasons hereafter stated, that the title put on the accounts is not decisive. We must decide what the accounts were, irrespective of what they were called by either party.
 
 
 28
 From June 1, 1941, through November 29, 1941, a total of $315,578.81 was credited to Account No. I and from December 1, 1941, through July 9, 1942, a total of $13,074.39 was credited to Account No. II the Reichsbank directing the Trust Company as to the particular account into which the money was to be deposited. These two accounts are the subject of the first two causes of action, and together make up the total amount of $328,653.20 involved in this action.
 
 
 29
 After June 1, 1941, no American creditor bank was ever advised by the Reichsbank of any apportionment of license fees, as to fees paid into the Trust Company after June 1, 1941, and no demand was made by any American creditor bank upon any of its German debtors for payment into the Reichsbank of an equivalent in reichsmarks as required by the agreements before release of the license fees by the Reichsbank to American creditor banks. No reichsmarks were thereafter paid into the Reichsbank by any German debtor of American creditor banks, or by any American creditor banks, or by any other person with respect to apportionment of license fees, as required by the agreements before the Reichsbank was to release its license fees on deposit with the Trust Company. By order dated November 25, 1947, the Attorney General vested these two license fee accounts as property owned by the German Reichsbank.
 
 V. Discussion
 Appellants put forth six points on appeal:
 
 30
 First, they say that their motion for summary judgment should have been granted because there is a presumption of ownership in the Trust Company based on the (a) designation on the depository Trust Company's ledgers as trustee accounts; (b) vesting and seizure as trustee accounts; (c) recognition of the Trust Company as the trustee of substantially identical accounts by the United States Treasury, and (d) recognition by the Reichsbank.
 
 
 31
 Cases are cited which, under the common law, would create a presumption of ownership in the person in whose name a fund is deposited. However, this is an action brought under a federal statute, and we do not believe that such presumptions are enough to satisfy the Act. The plaintiff, in an action under section 9(a) of the Act, mus t affirmatively prove that he is entitled to the property. The action is not in the nature of a judicial review of the Attorney General's vesting order, and he is not, therefore, required to establish the propriety of that order. Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604; Becker Steel Co. of America v. Cummings,296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54; La Due & Co. v. Rogers, 7 Cir., 259 F.2d 905; Kaufman v. Brownell, 101 U.S.App.D.C. 147, 247 F.2d 553, 556, certiorari denied 355 U.s,. 842, 78 S.Ct. 48, 2 L.Ed.2d 51, and United States v. The Antoinetta, 3 Cir., 153 F.2d 138, 143.
 
 
 32
 The burden which appellants must here sustain consists of a showing that they were the beneficial owners of the fund sought. La Due & Co. v. Rogers, supra; Feller v. McGrath, D.C.W.D.Pa., 106 F.Supp. 147, affirmed sub nom. Feller v. Brownell, 3 Cir., 201 F.2d 670; Thorsch v. Miller, 55 App.D.C. 295, 5 F.2d 118; Kaname Fujino v. Clark, 9 Cir., 172 F.2d 384; and Cordero v. United States, D.C.S.D.N.Y., 111 F.Supp. 556, affirmed sub nom. Cordero v. Brownell, 2 Cir., 211 F.2d 90. A showing of legal title to the fund is not enough to require the Attorney General to demonstrate that beneficial ownership does not exist. As was stated in Feller v. McGrath,supra, 106 F.Supp. at page 149:
 
 
 33
 'Section 9(a) of the Trading with the Enemy Act requires that a plaintiff 'establish' the 'interest, right or title' he claims. This means plaintiff has the burden of establishing that he is the beneficial owner of the property involved. * * * Beneficial ownership is the heart of the case; it is part of the plaintiff's prima facie case.'
 
 
 34
 An argument similar to appellants' here was put forth in La Due & Co. v. Rogers, supra, where the plaintiff, attempting under section 9(a) to recover bearer bonds seized from him, claimed that, under the Negotiable Instruments Law, possession of bearer paper constitutes prima facie evidence of title and that, in the absence of evidence in derogation of the title thus acquired, he was entitled to recover. The court squarely rejected this argument and dismissed the complaint, holding that 'mere title or possession is not sufficient.'
 
 
 35
 Thus, the presumptions upon which appellants' first argument rests were not sufficient to require the Attorney General to offer proof controverting beneficial ownership in the Trust Company. Granting the existence of the presumptions of ownership, appellants did not make out a prima facie case of beneficial ownership to satisfy the Act, and its judicial interpretations.
 
 
 36
 Second, the appellants urge that the German-American Standstill Agreement of 1941 came into existence and effect and was performed except to the extent that World War II, the Act and freezing regulations thereunder, made performance impossible and useless.
 
 
 37
 We feel that the German-American Standstill Agreement of 1941 never came into effect. It is admitted that no American bank ever effectively adhered to the 1941 Agreement. (One bank did adhere, but soon thereafter withdrew adherence.) Clause 22(7) of the 1941 Agreement, however, expressly provides that, in order to become a party to the Agreement, a bank, either creditor or debtor, must give the requisite notice of adherence. Appellants urge that their adherence to the 1941 Agreement was unnecessary because: (1) the Agreement became effective when signed by the German and American Committees; (2) the freezing order rendered adherence impossible; and (3) adherence was not a material term of the contract.
 
 
 38
 As to the signing by the German and American Committees, by its own admission, the American Committee was only an advisory body, having no legal rights which could be enforced either on its own behalf or on behalf of American banks. The American Committee did not have the power to bind American creditor banks to the Standstill Agreements. The signing by the American Committee, therefore, did not bring into existence or make effective the 1941 Agreement.
 
 
 39
 Appellant's contentions that adherence was unnecessary because immaterial is equally unsupportable in view of the manifest purpose of the license fee provisions to reimburse creditors in dollars rather than in reichsmarks in order to make extensions of credit more attractive to American banks. To assure the continuance of lines of credit, the Agreements stipulated that only those creditors who continued to make funds available to German debtors would have the privilege of converting reichsmarks to dollars. Adherence, i.e., the promise of the creditor to keep specified credit lines open, was the consideration for the Reichsbank's promise to make additional foreign exchange available to American creditor banks. Consequently, the failure of the American creditor banks to adhere to the 1941 Agreement constituted a total failure of consideration.
 
 
 40
 Appellants' further argument, that notices of adherence would have been useless and impossible because the United States Government would have prevented the consummation of the transactions provided for by the Agreement, and that therefore the court should consider the adherences as either effected or unnecessary, is not valid. Appellants' contention is, in effect, that they were excused from making the promise which was to be the consideration for the contract because performance thereof was impossible. It is crystal clear that, where there is no consideration flowing from one party to a contract, whether or not the consideration be impossible to perform, there is no contract.
 
 
 41
 Third, plaintiffs contend that because the Trust Company is trustee of the seized funds, it is entitled to recover.
 
 
 42
 Even if this court were to find that the Trust Company was and is trustee of the seized funds, this would not permit them to recover. Appellants could not recover without also establishing the existence and non-enemy status of the beneficiaries of the trust. Cordero v. United States, supra, is in point on this issue. There a concededly non-enemy administrator of a decedent's estate sought the return of vested property on behalf of enemy beneficiaries, claiming that as a fiduciary he was the holder of legal title and for that reason alone entitled to recover. The court denied the requested relief, stating at page 558 of 111 F.Supp.:
 
 
 43
 'Were the concern of the Trading with the Enemy Act with bare legal title, there would be merit to plaintiff's theory. However, the language of the Act itself, particularly Sections 5(b) and 7(c), and the judicial interpretations, all lead to the conclusion that the status of the beneficial owners is crucial. * * * As a fiduciary and nothing more, plaintiff may not recover when the persons to be benefited by a return of the property are enemies within the Act.'
 
 
 44
 Here there was no agreement, constituting the Trust Company trustee of the fund, in effect at the time these funds were collected. The existence of the 1941 Agreement was discussed under Appellants' second contention, and as to the 1940 agreement, we quote with approval the trial court:
 
 
 45
 'Nor is there any substantial merit in the plaintiffs' contention that the 1940 agreement was continued as a contract implied in fact. First, the conduct of the parties did not continue as it had under the 1940 agreement. For instance, no payments into the registered credit balances were made by German debtors, no credit lines were extended by the American creditors, and no apportionment was made by the Reichsbank. Furthermore, even if the conduct of the parties had continued substantially the same after the expiration of the 1940 agreement on May 31, 1941, no contract would therefore be implied. While it is often permissible to imply a contract when what is involved is a simple lease or a simple employment contract, one cannot as easily imply an intent to continue a detailed and complicated compact among international banks. It is especially difficult to imply such an intent in the context of this case. The history of these agreements discloses that formal extension was always the rule, even when the extension was for only a three-month period. Furthermore, the successive agreements were rarely if ever merely continued, but were always modified in one or more substantial ways. Still further, while it might be barely possible to find an intent in the two negotiating committees to continue the 1940 agreement, the committees were not the competent contracting parties, and it is impossible to imply an intent among all the creditors and all the debtors to continue the prior contract, with the same credit lines, the same methods of repayment, etc. In fact, it was undoubtedly the purpose of the complex adherence procedure to assure that each creditor and debtor would have control over the details of his own transaction.'
 
 
 46
 Appellants' fourth contention is that 'the 21 creditor banks are beneficial owners of the 'interest, right, or title' in or to the vested license fees, requisite to an order that same be returned to Manufacturers Trust Company.'
 
 
 47
 As we have held above, the 1941 Agreement never came into effect, and without an effective agreement at the time of collection of the license fees, the individual plaintiffs would have no claim to the fund, because any claim by the individual plaintiffs must necessarily rest upon either the 1940 or 1941 Standstill Agreement.
 
 
 48
 The fifth point urged by appellants is that 'the Trustee is entitled to return of the vested funds,' and the sixth and final point is that 'equity requires return of the vested funds to Manufacturers Trust Company, pursuant to the 1940 Agreement and operations thereunder, if action under the 1941 Agreement fell short of such requirement by reason of impossibility of full performance under the 1941 Agreement.' Both of these points are based upon an effective agreement at the time of the collection of the funds. There was, at that time, no effective agreement.
 
 
 49
 We believe that the trial court has correctly decided that neither the Trust Company nor the individual plaintiffs have shown the necessary interest in the fund to allow recovery, and we affirm the judgments entered.
 
 
 50
 However, there is another and even more cogent reason why the plaintiffs are not entitled to recover these license fees. The trial court found that the Reichsbank had no right, title or interest in the vested funds at the date of vesting. In this we disagree. We believe that these funds were owned by the Reichsbank. The trial court was of the opinion that if the plaintiffs acquired no interest in the vested license fees through the abortive 1941 Agreement, then the Reichsbank could not have acquired any interest in those fees through that Agreement either. We do not believe the Reichsbank's ownership of these fees was based on the Agreement. As pointed out previously, these fees were levied by Reichsbank regulations, independent of any agreement. There can be no doubt that the Reichsbank was the original owner of the fees. The Reichsbank regulations created the fees, to be collected for the Reichsbank upon its transfer of funds from the registered credit balances to the travel mark accounts, and the same regulations required collection of such fees. The 1937-1940 Standstill Agreements provided only for their disposition after collection. Prior to 1937, these fees were collected and retained by the Reichsbank.
 
 
 51
 The American Committee itself recognized the Reichsbank's original ownership and control of the fees. By letter dated November 14, 1940, the Committee wrote to the Secretary of the Treasury, in part, as follows:
 
 
 52
 'Under the regulations of the Reichsbank, American banks and dealers are required to collect on behalf of the Reichsbank a certain amount by way of License Fees from purchasers from them of Registered Marks for Travel and Benevolent Purposes, * * *.'
 
 
 53
 The description of the arrangement with the Amsterdaamsche Bank, set forth in that letter, confirms the fact that the license fees were the property of the Reichsbank until released to American creditor banks. This is also confirmed by the Reichsbank regulations and the Standstill Agreements when read in their entirety.
 
 
 54
 On January 2, 1958, after this action was instituted on November 1, 1957, Rudolph Harmening, Trustee of the Deutsche Reichsbank in West Berlin, signed a paper entitled 'Disclaimer and Release,' in which he says that he does not assert any right, title or monetary interest in the seized funds, and gives as his opinion that the trust administered by him never had any interest in such funds. Any such release or disclaimer is in no way binding upon the United States.
 
 
 55
 The vested accounts were made up of fees for German government licenses or permissions, and were in the ownership and control of the Reichsbank, a government agency, which could have used the funds as an inducement or reward for banks willing to cooperate on its terms in maintaining short-term credits. Because of developments in 1941, it was not required to so use the funds, and retained ownership and control until the funds became vested. This would be true even if the 1941 Agreement had become effective for reasons stated above.
 
 
 56
 Affirmed.
 
 
 
 *
 United States District Judge for the Northern and Southern Districts of West Virginia, sitting by designation
 
 
 [1]
 October 6, 1917, c. 106, 9, 40 Stat. 419, as amended, 50 U.S.C.A.Appendix, 1-40. Sec. 9(a) provides in part: '* * * any person not an enemy or ally of enemy claiming any interest, right, or title in any money * * * seized * * * and held * * * by the Treasury of the United States * * * may institute a suit * * * to establish the interest, right, title, * * * so claimed, and if so established the court shall order the * * * delivery to said claimant of the money * * *.'
 
 
 [2]
 The authority of the Alien Property Custodian was transferred to the Attorney General by Executive Order 9788, October 14, 1946, 11 Fed.Reg. 11981, 3 C.F.R. 1946, Supp. 169
 
 
 [3]
 This clause was contained in the German-American Standstill Agreement of 1940, and is typical of that contained in other prior agreements. This same caluse of the Agreements of 1933-1935, inclusive, provided that registered credit balances might be used under regulations of the Reichsbank to be established from time to time
 
 
 [4]
 Clause 4(10) of the Standstill Agreement of 1937 sets forth the manner in which the license fees were to be held, administered and disposed of
 
 
 [5]
 Defendant claims that the Trust Company mislabelled the accounts, contrary to instructions from the Reichsbank, and that such accounts were custodial accounts under sole and direct control of the Reichsbank. Plaintiffs claim that they were properly labelled